**CHICAGO TITLE INSURANCE COMPANY, et al., Plaintiffs,**

v.

**SHERRED VILLAGE ASSOCIATES, et al., Defendants.**

**Civ. No. 76–56 P.**

United States District Court,
D. Maine.

June 14, 1982.

Charles Harvey, John W. Philbrick, Verrill & Dana, Portland, Maine, Donald Memmer, Gladys Bryer, Chicago Title Ins. Co., Chicago, Ill., for plaintiffs.

Duane D. Fitzgerald, Bath, Maine, John J. Flaherty, Keith A. Powers, Portland, Maine, Charles W. Smith, Saco, Maine, Paula D. Silsby, Asst. U. S. Atty., Portland, Maine, Nancy Christopher, Geoffrey Patton, HUD, Washington, D. C., for defendants.

## OPINION AND ORDER OF THE COURT

GIGNOUX, Chief Judge.

This action, seeking a declaratory judgment on the respective priorities of a mechanic's lien and a mortgage assigned to the Department of Housing and Urban Development (HUD), is before the Court for the second time, on a remand from the Supreme Court for reconsideration in light of that Court's intervening decision in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). The Court concludes that state lien priority law is to be adopted as the federal rule of decision, and, accordingly, that the mechanic's lien is superior to the mortgage in the present case.

### I

### FACTUAL SETTING

Sherred Corporation, as contractor for Sherred Village Associates (Sherred), the owner and developer of the Sherred Village moderate income housing project in Bath, Maine, entered a contract in 1971 with Hercoform Incorporated pursuant to which Hercoform, as prime subcontractor, agreed to provide and erect prefabricated housing units for the project. In 1972, Sherred obtained mortgage financing for the project from the New England Merchants National Bank, whose loan was insured by HUD under Section 236 of the National Housing Act, 12 U.S.C. § 1715z–1. A regulatory agreement between HUD and the developer was recorded along with the mortgage on the day the latter was executed. Chicago Title Insurance Company insured the developer's title in the mortgaged property for the benefit of the Bank; among the risks insured against were liens superior to the mortgage.

Following completion of the project in 1973, Hercoform filed in the Sagadahoc County, Maine, Registry of Deeds a mechanic's lien claim for $440,986.03 in assertedly unpaid bills on the project. On the day the lien was recorded, December 20, 1973, Hercoform also commenced an action in the Sagadahoc County Superior Court to enforce its claim.

When Sherred defaulted on its payments in 1974, the Bank assigned its mortgage to HUD. In the assignment the Bank warranted to HUD that the mortgage would have priority over all mechanics' and materialmen's liens recorded after the date on which the mortgage was recorded.

It is undisputed that under Maine law Hercoform's lien has priority over the mortgage, since Hercoform, with the consent and knowledge of Sherred, performed services as subcontractor before the mortgage was given and timely filed its lien claim and complaint. 10 M.R.S.A. §§ 3251 *et seq.*; *Lyon v. Dunn*, 402 A.2d 461, 463 (Me.1979). Prior to any resolution of Hercoform's state court suit, however, the Bank and Chicago Title brought the present action in this Court under the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaration that the government's mortgage lien takes priority over Hercoform's mechanic's lien. Hercoform and HUD were named as defendants.

Following an evidentiary hearing, this Court ruled on February 16, 1977, that the traditional federal "first in time, first in right" and choateness doctrines applied as the rule for determining lien priority in this case. Accordingly, the Court held that the mortgage assigned to HUD by the Bank

was entitled to priority over the mechanic's lien asserted by Hercoform. After an affirmance by the First Circuit Court of Appeals, 568 F.2d 217 (1st Cir. 1978), the Supreme Court granted certiorari, vacated the judgment, and remanded the case, 441 U.S. 901, 99 S.Ct. 1987, 60 L.Ed.2d 370 (1979), for further consideration in light of *United States v. Kimbell Foods, Inc., supra.* In an order entered May 22, 1979, the First Circuit remanded the action to this Court. Following a request by HUD, which has joined with plaintiffs Chicago Title and the Bank in asserting the priority of the mortgage over the mechanic's lien,[1] this Court ordered the record reopened and conducted an evidentiary hearing with respect to the operation of the HUD Section 236 program under which this project was undertaken.

Section 236 of the National Housing Act, 12 U.S.C. § 1715z–1, establishes a program to facilitate the construction of rental housing for lower income families. Under the program, the Secretary of Housing and Urban Development is authorized to insure mortgages and to make interest reduction payments that effectively reduce the rate of interest on the projects to as little as 1%. Not surprisingly, the program is rather complicated and involves a number of participants.[2]

Typically, a project originates with an application from a nonprofit or limited distribution sponsor to the appropriate field office of the Federal Housing Administration (FHA)[3] seeking issuance of a site appraisal and market analysis (SAMA) letter. 24 C.F.R. § 236.5. Representatives from the field office visit and appraise the site and assess the marketability of the proposal. If the project appears feasible, the FHA issues a SAMA letter inviting the sponsor to submit an application for a conditional commitment.

At that point, the sponsor must find an FHA-approved lender, 24 C.F.R. §§ 236.1, 221.528, 203.1–203.9, who is willing to initiate the loans needed for construction and permanent financing of the project. The sponsor and lender apply to HUD for a conditional insurance commitment, setting out in the application a broad description of the project, including estimated construction and operating costs; providing detailed estimates of operating expenses and other financial considerations; and identifying other participants, including the contractor and architect, if known. 24 C.F.R. §§ 236.1, 221.509; FHA Form No. 2013. In reviewing the application, the FHA field office examines the experience and previous record of the various named participants to ensure their reliability and ability to complete the project, runs an initial check on the accuracy of the estimated costs, and carefully considers the feasibility of the particular project.

If the FHA accepts the project, it issues a conditional commitment for insurance, subject to compliance by the sponsor (mortgagor) and lender (mortgagee) with a long list of requirements prior to issuance of a firm commitment and initial closing. Among those requirements are: the mortgage; certificates from the mortgagor and mortgagee; a policy of title insurance running to the mortgagee and HUD (although this requirement may be waived by the Commissioner of the FHA if title insurance is unavailable, 24 C.F.R. §§ 236.1, 221.563); assurance of completion of the project, typically in the form of either performance and payment bonds or a completion assurance agreement (and meeting at a minimum the requirements set forth in 24 C.F.R. § 221.542, as incorporated by *id.* § 236.1); assurance of completion of off-site facilities; a detailed cost breakdown; and evidence of compliance with local zoning requirements.

---

**1.** Unless otherwise indicated, subsequent references to "plaintiffs" should be understood to include HUD.

**2.** The Federal Housing Administration is no longer accepting applications for Section 236 projects, but some projects remain under construction.

**3.** Multifamily projects in Maine are now handled primarily by the FHA area office in Manchester, New Hampshire. The FHA also has an insuring office in Bangor, Maine, which was involved in multifamily projects in Maine until a reorganization of the FHA some years ago.

*See* FHA Form No. 3618. The required mortgage form specifies that the mortgagor "will not voluntarily create or permit to be created . . . any lien or liens inferior or superior to the lien of this Mortgage and . . . will keep and maintain the [property] free from the claim of all persons supplying labor or materials . . . ." FHA Form No. 4125–B, ¶ 15; *see* 24 C.F.R. §§ 236.1, 221.-520. The mortgagor certifies to the FHA that the mortgaged premises are free and clear of all liens other than the insured mortgage, unless the FHA has specifically agreed to an exception, FHA Form No. 2433; and the mortgagee agrees to abide by all applicable FHA regulations, FHA Form No. 2434.

In deciding whether to initiate a loan, the mortgagee is authorized both by regulation, 24 C.F.R. §§ 236.1, 221.542, and by HUD instructions, *see* Initial Closing Commitment for Project Mortgage Insurance, HUD Handbook 4430.1, ¶ 1–12, to require of the mortgagor whatever additional security, including personal indemnity agreements, it deems necessary to assure completion of the project. Before it can receive FHA mortgage insurance benefits in the event of default, however, the mortgagee must warrant that "the mortgage is prior to all mechanics' and materialmen's liens filed on record subsequent to the recording of the mortgage, regardless of whether such liens attached prior to the recording date," and that the mortgage is prior to any other liens which may have attached or arisen subsequent to the recording of the mortgage. 24 C.F.R. §§ 236.251, 207.258.

Construction loans on Section 236 projects frequently are advanced by the mortgagee itself;[4] but on the permanent loans the mortgagee often relies on the secondary mortgage market, where the primary participant is the Government National Mortgage Association (GNMA), a government corporation within HUD.[5] In a typical such case, after the FHA has issued a commitment on a project, but prior to the initial closing, the mortgagee seeks a commitment from GNMA to purchase the permanent loan. *See* GNMA Sellers Guide § 917. Before it will agree to purchase a loan, GNMA requires a commitment for mortgage insurance from FHA and has the Federal National Mortgage Association (FNMA), a private corporation established by Congress with various responsibilities in the secondary mortgage market, act as its agent and review documents submitted by the mortgagee to ensure compliance with GNMA purchasing requirements. GNMA Sellers Guide § 604. In addition, GNMA requires the mortgagee to enter a Selling Contract, GNMA Form 301, which includes a number of warranties, one being that the property is free and clear of all mechanics' and materialmen's liens or rights that could give rise to such liens (with an exception if the mortgagee provides GNMA with a title policy affording protection against such liens). If its requirements are met, GNMA may issue a commitment to purchase the permanent loan upon completion of construction, conditional upon the mortgagee having complied with all warranties. Under the Selling Contract GNMA may require the mortgagee to repurchase the mortgage if it turns out that any of the warranties has not been satisfied.

Actual construction of a Section 236 project is handled by a contractor and subcontractors. The contractor, who may also be the sponsor, typically works fairly closely with local FHA representatives in finalizing plans for the project. Each Section 236 project may also involve a number of subcontractors, ranging from large, relatively sophisticated companies to small, local concerns with little or no experience on HUD projects.

As noted above, if GNMA has entered a commitment contract, it is required to purchase the permanent mortgage following

---

4. Secondary financing for construction loans on Section 236 programs is available through the Federal National Mortgage Association (FNMA). FNMA FHA/VA Mortgage Selling Contract Supplement § 302.

5. In the present case, the Bank did not place the loan on the secondary mortgage market.

completion of construction if the mortgagee has complied with all requirements of the contract. Under its project mortgage sale program, GNMA then resells the mortgages to private investors through a nationwide auction system. In the event of default on the mortgage, the ultimate purchaser is entitled to receive payment of the FHA mortgage insurance benefits, provided the requirements for assignment to FHA are met. 24 C.F.R. §§ 236.265, 207.259. If a defect that was in existence as of the closing date of the purchase from GNMA prevents the purchaser from recovering from the FHA as insurer, the purchaser is entitled to require correction of the defect or repurchase by GNMA. *See* GNMA Sellers Guide § 1005.

## II

## THE LAW

This Court's analysis starts with the Supreme Court's unanimous opinion in *United States v. Kimbell Foods, Inc., supra.* In that decision, the Supreme Court considered "whether contractual liens arising from certain federal loan programs take precedence over private liens, in the absence of a federal statute setting priorities." *Id.*, 440 U.S. at 718, 99 S.Ct. at 1453. The Court initially determined that "the priority of liens stemming from federal lending programs must be determined with reference to federal law." *Id.* at 726, 99 S.Ct. at 1457. In giving content to that federal law, however, the Court set forth a three-part balancing test to determine whether federal courts should fashion a uniform federal priority rule or incorporate state law as the federal rule of decision. Applying that test to the Small Business Administration (SBA) and Farmers Home Administration (FmHA) loan programs before it, the Court concluded that "a national rule is unnecessary to protect the federal interests underlying the loan programs," and accordingly adopted state law as the appropriate federal rule of decision. *Id.* at 718, 99 S.Ct. at 1453.

The central issue in this case appears to be virtually identical to that in *Kimbell Foods*: whether a contractual lien arising from a federal loan program takes precedence over a private lien. Nevertheless, plaintiffs strenuously resist the application of state law, seeking to distinguish *Kimbell Foods* in several ways.

### A. *Congressional Intent*

Plaintiffs first argue that the *Kimbell Foods* analysis by its own terms does not apply, since, they assert, Congress has indicated an intent that state law not govern priority of HUD mortgages. Plaintiffs are correct that a clear indication of congressional intent would render *Kimbell Foods* inapplicable; throughout that opinion, the Supreme Court emphasized the absence of a congressional directive regarding priority of liens in the lending programs there at issue. *See United States v. Kimbell Foods, Inc., supra,* 440 U.S. at 718, 735, 740, 99 S.Ct. at 1453, 1462, 1464. Contrary to plaintiffs' assertion, however, Congress has given no such directive in the present case.

 Plaintiffs find the asserted congressional intent primarily in the National Housing Act itself. They note that HUD's authority under that Act is to insure "mortgage[s]," *see, e.g.,* 12 U.S.C. §§ 1709(a), 1715z–1(j)(1), and contend that the statutory definition of "mortgage" as a "first mortgage," 12 U.S.C. § 1707(a), requires the application of a uniform federal rule of priority. Yet an examination of the full statutory definition strongly suggests quite the opposite conclusion, for Section 1707(a) goes on to state that "the term 'first mortgage' means such classes of first liens as are commonly given to secure advances on, or the unpaid purchase price of, real estate, *under the laws of the State, in which the real estate is located,* together with credit instruments, if any, secured thereby." (emphasis added).[6] While this definition does not expressly indicate whether state law is to govern lien priorities, it does reveal a congressional intention that state law

---

**6.** The record discloses that the mortgage assigned to HUD in this case is of the type commonly given to secure advances on real estate under the laws of Maine.

define the type of mortgage HUD may insure—without question a central element of the entire Act.[7]

Plaintiffs also argue that the enumeration in the National Housing Act of taxes, special assessments, and water rates as liens prior to the mortgage in the event of default, 12 U.S.C. § 1713(g), indicates a congressional intention that no other prior liens be recognized. That provision does not, however, reveal a clear congressional intent regarding the priority of unspecified liens. In fact, the Supreme Court regarded a similar provision in the SBA lending program, 15 U.S.C. § 646, as further support for its conclusion that state law should be incorporated to determine the priority of other liens. *United States v. Kimbell Foods, Inc., supra*, 440 U.S. at 735 & n.36, 99 S.Ct. at 1462 & n.36.

Finally, plaintiffs note that the Multifamily Mortgage Foreclosure Act of 1981, 12 U.S.C.A. § 3701 *et seq.*, establishes a set of priorities for payment of proceeds from the foreclosure of multifamily mortgages assigned to HUD, under which mechanics' liens filed after the mortgage are to be paid only after the mortgage and various other expenses, 12 U.S.C.A. §§ 3711, 3712. No foreclosure proceedings are involved in the present action; and the 1981 Act, which applies only to the foreclosure of multifamily mortgages, does not directly govern this case. Nor do plaintiffs so contend. Rather, they argue that this Act represents a further declaration of Congress' *original* intent that a uniform federal priority system apply to mortgages arising from HUD programs. Yet Congress, while expressly indicating, both in its statutory findings, 12 U.S.C.A. § 3701(a)(1), and in the legislative history, S.Rep.No.139, 97th Cong., 1st Sess. 236, *reprinted in* 1981 U.S.Code Cong. & Ad.News 396, 532; H.R.Conf.Rep.No.208, 97th Cong., 1st Sess. 715, *reprinted in* 1981

U.S.Code Cong. & Ad.News 1010, 1074, its understanding that the 1981 Act was pre-empting a variety of state laws that had previously applied, did not choose to extend the new legislation beyond the foreclosure process. In fact, the Senate Report on the bill clearly states that the Act is "not intended to affect substantive rights except as explicitly set out in the bill." S.Rep.No. 139, *supra*, 264, *reprinted in* 1981 U.S.Code Cong. & Ad.News at 560. Thus, contrary to plaintiffs' assertion, the Act and its legislative history strongly suggest that Congress understood state law to govern various aspects of the mortgage programs, including lien priority, and chose to preempt that state law in only the relatively narrow area of multifamily mortgage foreclosure.

In sum, plaintiffs have not established a congressional intention that a uniform federal rule of priority apply in cases such as the present.

### B. *Kimbell Foods Test*

In the absence of a congressional directive, the *Kimbell Foods* analysis comes into play. Under that decision, it is beyond dispute that federal law controls the priority of liens stemming from the HUD lending program, *see United States v. Kimbell Foods, Inc., supra*, 440 U.S. at 726–27, 99 S.Ct. at 1457. The more difficult task, here as in *Kimbell Foods*, is giving content to the federal rule. This Court is aided in that task by the three principles set forth by the Supreme Court for determining whether to adopt state law or to fashion a uniform federal rule: the need for uniformity; the likelihood of frustration of specific federal objectives; and the potential for disruption of commercial relationships. *Id.* at 728–29, 99 S.Ct. at 1458–59. It is to those principles that this Court now turns.

---

**7.** This Court accepts the conclusion in *United States v. View Crest Garden Apts., Inc.*, 268 F.2d 380, 382–83 (9th Cir.), *cert. denied*, 361 U.S. 884, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959), that Congress did not, through § 1707(a), adopt all incidents of the mortgage relation under state law; but, to the extent that that opinion may be read as finding that § 1707(a) was intended to refer only to such procedural matters as state recording acts, this Court disagrees. *See also Pankow Construction Co. v. Advance Mortgage Corp.*, 618 F.2d 611 (9th Cir. 1980).

### 1. *Need for Uniformity*

As the Supreme Court explained, "federal programs that 'by their nature are and must be uniform in character throughout the Nation' necessitate formulation of controlling federal rules. . . . Conversely, when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision." *United States v. Kimbell Foods, Inc., supra,* 440 U.S. at 728, 99 S.Ct. at 1458 (citations and footnote omitted), *quoting United States v. Yazell,* 382 U.S. 341, 354, 86 S.Ct. 500, 507, 15 L.Ed.2d 404 (1966). This point need not long detain the Court, for the *Kimbell Foods* discussion, 440 U.S. at 729–33, 99 S.Ct. at 1459–61, makes clear that no overriding need for uniformity exists with respect to the program before this Court.

While there are many differences between the administration of the SBA and FmHA loan programs considered in *Kimbell Foods* and the administration of the FHA loan program now before this Court, those differences are vastly outweighed by striking similarities in the key factors underlying the Supreme Court's conclusion on this point. The FHA, in a similar manner to the SBA and FmHA, operates its insurance operations through field offices familiar with conditions in the respective states and staffed with local counsel for each state. In addition to requiring compliance with state procedural requirements, the FHA looks to state and local laws on a number of substantive points, including statutory bonding requirements to assure completion, HUD Handbook 4430.1, *supra,* ¶ 1–12(e)(2), and priority of liens on the personal property of the mortgagor, *see, e.g.,* FHA Form No. 3229–B, Commitment for Insurance of Advances ¶ 13. Furthermore, just as in the SBA and FmHA programs, each application for FHA insurance receives extensive individual scrutiny and is personally negotiated. While the statutes and regulations set maximum mortgage amounts, *see, e.g.,* 12 U.S.C. §§ 1715z–1(j), 1715*l*(d)(3); 24 C.F.R. § 236.12, and prescribe minimum standards for security to assure completion, 24 C.F.R. §§ 236.1, 221.542, the FHA is free to tailor its coverage by prescribing more stringent requirements for particular projects. *Id.*

In light of the foregoing, the Court is convinced that incorporating state priority law will not hinder administration of this FHA loan program, and that in this case, as in *Kimbell Foods,* "considerations of administrative convenience do not warrant adoption of a uniform federal law," *United States v. Kimbell Foods, Inc., supra,* 440 U.S. at 733, 99 S.Ct. at 1461.

### 2. *Frustration of Federal Objectives*

The second principle, related to the first, is "whether application of state law would frustrate specific objectives of the federal programs." *United States v. Kimbell Foods, Inc., supra,* 440 U.S. at 728, 99 S.Ct. at 1458. Plaintiffs strenuously contend that application of state lien laws would harm HUD and GNMA and discourage private lenders and investors from participating in the housing programs under the National Housing Act, and thus would severely impair the housing programs themselves. This Court disagrees.

Plaintiffs argue that HUD, GNMA, and private investors who purchase mortgages from GNMA all will be placed at risk of financial loss if state priority law is adopted, and that a special federal priority rule is needed because FHA-insured loans are made only when conventional lending standards cannot be met and are supported by less security than loans on typical commercial projects. Yet the economic soundness of the loans is already assured in a number of ways. The FHA, like the SBA and FmHA, has established exhaustive regulations and instructions to ensure that recipients of FHA-insured loans are financially reliable and that the projects are economically sound. *See, e.g.,* 24 C.F.R. §§ 200.210, 236.1, 221.509; *supra* pp. 3–5. To assure completion of the project (including payment of any amounts due subcontractors or other participants in construction of the project), FHA requires certain levels of security, 24 C.F.R. §§ 236.1, 221.542, and may demand a personal indemnity agreement

from the mortgagor or other additional security. *Id.* These protections alone would appear to provide sufficient security to safeguard the objectives of the FHA-insured loan programs. *See United States v. Kimbell Foods, Inc., supra,* 440 U.S. at 737, 99 S.Ct. at 1463.[8]

In addition, HUD is given express contractual protection against mechanics' liens. The FHA requires assurances from the mortgagor, both in the mortgage itself and by separate contractual agreements, that the property will be kept free of *all* liens other than the insured mortgage, including the claims of "persons supplying labor or materials" and even inferior liens. FHA Form Nos. 4125–B, 2433; *see* 24 C.F.R. §§ 236.1, 221.513, 221.520. HUD is further protected from mechanics' liens by the requirement that a mortgagee, in order to be entitled to FHA insurance benefits in the event of default, warrant that the mortgage is prior to mechanics' and materialmen's liens and to any other liens that may have arisen subsequent to the recording of the mortgage. 24 C.F.R. §§ 236.251, 207.-258, 207.259. This requirement applies both to the initiating lender, if it continues to hold the mortgage, and to GNMA or a subsequent qualified purchaser from GNMA, in the event the mortgage is sold on the secondary market, since upon purchase of the mortgage the purchaser becomes the mortgagee and is subject to the FHA insurance regulations. *See* 24 C.F.R. §§ 236.1, 221.528, 203.6, 203.7.

Both GNMA and subsequent purchasers are also contractually shielded from the risk of losses by way of mechanics' and materialmen's liens. GNMA is protected by the warranty given it by the initiating lender that the property is free and clear of all such liens or rights that could give rise to such liens, or by the alternative requirement of title insurance protecting against such liens, *see* Selling Contract, GNMA Form 301; and GNMA has the right to require repurchase if the warranties prove

untrue, *id.* Finally, a purchaser from GNMA is in turn protected against mechanics' and materialmen's liens by the contractual agreement of GNMA either to repurchase the mortgage or to correct any defect preventing recovery from the FHA as insurer. *See* GNMA Sellers Guide § 1005.

Plaintiffs next contend that, if state law is adopted and the FHA and GNMA do not waive the warranties against mechanics' liens, initiating lenders will be unwilling to participate in the FHA-insured mortgage programs. The evidence simply does not support this contention.

The record discloses that in deciding whether to initiate loans for a Section 236 or other FHA-insured project, lenders do not simply rely upon the existence of FHA mortgage insurance. Rather, they seek to ensure that they become involved only in responsible projects for which resort to HUD insurance will not be necessary. In addition to reviewing the participants and projects carefully before agreeing to initiate the loans, lenders take a number of steps to protect against various risks, including mechanics' liens. One major method of protection is title insurance. Not only do the lenders generally demand title insurance, it is normally required by both the FHA, 24 C.F.R. §§ 236.1, 221.563, and GNMA, which generally requires title insurance coverage that includes protection against mechanics' lien coverage before it will agree to purchase a mortgage, GNMA Sellers Guide § 604(9)(c). The evidence, moreover, shows that such coverage is currently available. Representatives of title insurance companies testified that their companies issue policies that include mechanics' lien coverage for FHA-insured projects, even in states such as Maine where mechanics' liens may take priority over previously recorded mortgages, and in doing so do not now rely on a belief that a special federal rule of priority applies. Further-

---

**8.** An FNMA official testified at the trial that the rate of default on FHA-insured projects in the FNMA and GNMA portfolios has recently been running at only 0.5% (obviously not all related to mechanics' and materialmen's liens).

more, lenders may impose additional security requirements beyond the minimum HUD standards. As previously noted, HUD regulations and instructions make clear that initiating lenders may require of the mortgagor whatever security is deemed necessary to ensure completion of the project. 24 C.F.R. §§ 236.1, 221.542; HUD Handbook 4430.1, *supra,* ¶ 1–12. Finally, the initiating lenders' own testimony does not support plaintiffs' assertion that such lenders, in deciding whether to initiate loans, now rely on a belief that a special federal rule of priority applies to FHA-insured mortgages.[9]

Upon the present record, the Court can perceive no significant impact on participation in the FHA program at issue by application of state lien priority law, and is satisfied that adoption of that law will not frustrate the specific objectives of this federal program.

### 3. *Disruption of Commercial Relationships*

The final consideration under *Kimbell Foods* is "the extent to which application of a federal rule would disrupt commercial relationships predicated on state law." *United States v. Kimbell Foods, Inc., supra,* 440 U.S. at 729, 99 S.Ct. at 1459. As the Supreme Court observed, "In structuring financial transactions, businessmen depend on state commercial law to provide the stability essential for reliable evaluation of the risks involved." *Id.* at 739, 99 S.Ct. at 1464. This Court is persuaded that the protection of contractors who rely on state mechanics' lien law to safeguard their interests re-

quires application of that law as the federal rule of decision. Rejection of the settled body of state lien laws [10] in favor of an ill-defined federal priority rule subject to case-by-case development would create substantial new uncertainties and undermine the stability necessary for participants in these projects to evaluate their risks.[11] *See United States v. Kimbell Foods, Inc., supra,* 440 U.S. at 739–40 & n.42, 99 S.Ct. at 1464 & n.42. In contrast, adoption of the ready-made body of state law as the federal rule of decision will ensure the predictability needed for the long-range planning involved. *See Pankow Construction Co. v. Advance Mortgage Corp.,* 618 F.2d 611, 615–16 (9th Cir. 1980).

### 4. *Conclusion*

As the above discussion makes clear, the Court is satisfied that no overriding need for uniformity exists with respect to the HUD program before this Court, that the occurrence of any adverse impact on federal objectives as a result of the adoption of state law as the federal rule of decision in this case is highly unlikely, and that adoption of state law will significantly aid in providing the stability of commercial relationships essential to the functioning of the Section 236 program. The Court therefore concludes that the relative priority of Hercoform's mechanic's lien and the mortgage assigned to HUD is to be determined under Maine lien law. *See Pankow Construction Co. v. Advance Mortgage Corp., supra,* 618 F.2d at 616. Since it is undisputed that, under Maine law, Hercoform's me-

---

9. None of the three initiating lenders who testified indicated such reliance. In fact, one lender testifying for HUD, when asked why he was concerned about a ruling that state law be incorporated, candidly admitted that he was "not worried about mechanic's liens" insofar as his company's risks were involved.

10. For example, the Maine mechanics' lien law is part of a comprehensive statutory scheme, 10 M.R.S.A. §§ 3251–3269, "designed to protect the rights of the owner as well as to afford security for those performing labor or furnish-

ing labor or materials." *Pineland Lumber Co. v. Robinson,* 382 A.2d 33, 38 (Me.1978).

11. Counsel for HUD asserts that Hercoform, a relatively large corporation not based in Maine, would not reasonably have expected the Maine mechanics' lien law to apply. Even if this were conclusively supported by the record, the Court would regard the particular expectations of a single company as only marginally relevant to the question before it: whether application of a federal rule would disrupt commercial relationships predicated on state law.

chanic's lien is prior to the mortgage assigned to HUD, the Court so finds.

### III

### ORDER

Judgment will be entered declaring that Hercoform's mechanic's lien is superior to the mortgage assigned to HUD.[12]

IT IS SO ORDERED.

### DECLARATORY JUDGMENT

Pursuant to the Opinion and Order filed this date, it is

ORDERED, ADJUDGED and DECREED that:

The lien claimed by Hercoform Incorporated in its lien action now pending in the Sagadahoc County Superior Court (Docket # 2264) is found and declared to be superior to the mortgage granted by Sherred Village Associates to New England Merchants National Bank dated May 2, 1972 and recorded in the Sagadahoc County Registry of Deeds, Volume 382, Page 312, said mortgage having been assigned to the Secretary of Housing & Urban Development by assignment dated December 19, 1974 and recorded in said Registry of Deeds, Book 402, Page 317, and that said lien and lien claim are entitled to priority over said mortgage.

---

**12.** Plaintiffs have argued in the alternative that a decision to incorporate state law as the federal rule of decision should be adopted purely prospectively. The Court can perceive no basis for declining to apply this decision to the controversy now before it, *see, e.g., Stovall v. Den-no*, 388 U.S. 293, 300–01, 87 S.Ct. 1967, 1971–72, 18 L.Ed.2d 1199 (1967), but need not and does not express an opinion on whether the rule announced in this decision should otherwise apply only prospectively.