**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jose Luis CASTRO, Alberto Duque, Gaston Pereira, Jaime Bayon, Defendants–Appellants.**

**No. 86–5315.**

United States Court of Appeals, Eleventh Circuit.

Feb. 8, 1988.

John W. Nields, Jr., Howrey & Simon, Martin J. Weinstein, Richard A. Ripley, Washington, D.C., for Jose Luis Castro.

John F. Evans, Zuckerman, Spaeder, Taylor & Evans, G. Richard Strafer, Coral Gables, Fla., James Jay Hogan, Miami, Fla., for Alberto Duque.

Jeffrey D. Swartz, Miami, Fla., for Gaston Pereira.

Paul A. McKenna, Miami, Fla., (ct.-apptd.) for Jaime Bayon.

Leon B. Kellner, U.S. Atty., Caroline Heck, Linda Collins Hertz, David O. Leiwant, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellees.

PETITIONS FOR REHEARING AND SUGGESTION OF REHEARING IN BANC

(October 13, 1987, 11 Cir., 1987, 829 F.2d 1038)

Before RONEY, Chief Judge, ANDERSON and EDMONDSON, Circuit Judges.

EDMONDSON, Circuit Judge:

Both the government and defendant-appellant Duque have moved for rehearing. We take this opportunity to explain our denial of both motions for rehearing and to correct a point in our original opinion.

The government requests rehearing based on its reading of dicta in footnote 25 of our opinion, *United States v. Castro*, 829 F.2d 1038, 1047 (11th Cir.1987), concerning the elements necessary to a violation of 18 U.S.C. sec. 656. The government asserts that our finding of harmful error in the misjoinder of Castro in the trial of his co-defendants was based in large part on what the government claims to be a misunderstanding of the crime of misapplication of bank funds. Although we dispute this assertion, we here observe only that nothing in footnote 25 is a holding. Consequently, we believe that no court in the future will read our discussion of the misapplication of bank funds as changing the current elements of the crime or as advancing the idea that notice to the bank is a proper and absolute defense to the crime, rather than simply one factor to be considered. We therefore deny the government's request for rehearing, noting that nothing in the original opinion prevents the government from retrying defendant Castro for any crimes of which the government believes he is guilty.

Defendant Duque has also requested a rehearing, objecting to our reading of the Federal Bill of Lading Act ("FBLA" or "Act") as encompassing bills of lading issued abroad. While further study of the statute and its history have revealed that we were incorrect to base, in part, our analysis of 49 U.S.C. sec. 81 on the United States Code heading for that section,[1] we are convinced that the result reached by our previous analysis remains correct.

A general guide to statutory construction states "that the mention of one thing implies the exclusion of another; expressio unius est exclusio alterius." 73 Am.Jur.2d, *Statutes*, sec. 211, at 405. *See, e.g., Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19–24, 100 S.Ct. 242, 247–49, 62 L.Ed.2d 146 (1979); *Associates Commercial Corp. v. Sel–O–Rak Corp.*, 746 F.2d 1441, 1444 (11th Cir.1984); *Belluso v. Turner Communications Corp.*, 633 F.2d 393, 397 (5th Cir.1980); *United States v. Capeletti Bros., Inc.*, 621 F.2d 1309, 1315 (5th Cir.1980).

As is readily acknowledged, this principle has its limits and exceptions and

---

1. Titles and section headings can serve as limited interpretive aids if the statute itself is ambiguous. *See Scarborough v. Office of Personnel Management*, 723 F.2d 801, 811 (11th Cir.1984) ("Section headings cannot limit the plain meaning of the text and may be utilized to interpret a statute, if at all, only where the statute is ambiguous.")

In the present case, however, further research has revealed that the heading to 49 U.S.C. sec. 81, "Transportation included," was not part of the statute as passed by Congress, *see* 39 Stat. 538, ch. 415, sec. 1, but was added subsequent to enactment by those responsible for codification of the legislation. This title cannot therefore properly be of aid in determining the intent of Congress as regards section 81. *See Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1039 (D.C.Cir.1986) (where section subtitle was not added by publisher or codifier, but was part of act as written and passed by Congress, subtitle was an indication of congressional intent); 73 Am.Jur.2d, *Statutes*, sec. 96, at 321 ("Where headings of chapters, articles, or sections are mere arbitrary designations inserted for convenience of reference by clerks or other persons who have no legislative authority, such heads are held not to be proper matters for consideration in the interpretation of the statute.") For this reason we are withdrawing that portion of our original opinion in this case which looks to the heading of section 81 to discern the meaning of that section.

As a final observation, not intended to excuse our own oversight, we note that it was the government, in its brief, that first argued the significance of "Transportation included" to support its position. While disputing the government's interpretation of this language, appellant Duque did not, in *either* his reply brief *or* in his more recent motion for rehearing, point out that the heading was not part of the original statute as passed by Congress. It was only during our consideration of Duque's motion for rehearing that this court discovered the flaw in the government's argument, that was inadvertently adopted by the court in its original opinion. This serves as a reminder to all participants in the adversarial legal system of our country that the quality of the decisions rendered by the judiciary depends in large part on the quality and correctness of arguments made and supported by the litigants.

cannot apply when the legislative history and context are contrary to such a reading of the statute.[2] *See, e.g., Herman & MacLean v. Huddleston,* 459 U.S. 375, 387 n. 23, 103 S.Ct. 683, 690 n. 23, 74 L.Ed.2d 548 (1983) (rejecting application of *expressio unius* principle and holding that availability of express remedy under one section of Securities Act of 1933 did not preclude maintenance of action under another section of act, in light of purposes of act); *Bailey v. Federal Intermediate Credit Bank,* 788 F.2d 498, 500 (8th Cir.) (list in 12 U.S.C. sec. 2072 of 21 powers vested in intermediate credit banks was not exclusive; banks also had implicit power to remove officer of production credit association), *cert. denied,* —— U.S. ——, 107 S.Ct. 317, 93 L.Ed.2d 290 (1986); *State of Illinois, Dep't of Public Aid v. Schweiker,* 707 F.2d 273, 277 (7th Cir.1983) ("Not every silence is pregnant;" holding that agency decision of disallowance was subject to judicial review in district court although Congress said nothing about judicial review in statute section relating to disallowances, while specifically providing for review in appellate court in another section relating to agency determinations of plan nonconformity); *Chicago Title Ins. Co. v. Sherred Village Ass'n,* 544 F.Supp. 320, 326 (D.Me. 1982) (enumeration of certain prior liens—taxes, assessments, water rates—in 12 U.S.

C. sec. 1713(g) did not indicate congressional intent that other unspecified prior liens go unrecognized), *aff'd,* 708 F.2d 804 (1st Cir.1983); *cf. Church of the Holy Trinity v. United States,* 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892) (although action contested clearly fell within letter of law, court held that action was plainly outside spirit of law).

Appellant Duque argues that Congress, by making no mention in section 81 of goods transported from a foreign country to a state, deliberately meant to exclude bills of lading related to foreign imports from the ambit of the act. While it is unnecessary to decide the full scope of section 81 because our decision rests on a different point, our impression is that Duque's reading of the section is contradicted by the Act's legislative history. The *expressio unius* rule seems therefore inapplicable here.

First, there is indication in the legislative history that Congress intended to include imports under the statute. The substantive discussion of the bill in the Senate Report begins with the statement: "The total exports and imports for the year 1915 amounted to $5,329,521,248." S.Rep. No. 149, 64th Cong., 1st Sess. 1 (1916). Elsewhere, the Senate Report speaks of the

**2.** A discussion of the *expressio unius* idea is always necessarily accompanied by a discussion of its limitations. The following excerpts suggest that this is perhaps a rule honored more in the breach than in the observance:

> The maxim ... is not of universal, but of limited, use and application. It is an aid to construction, not a rule of law. It is not conclusive, is applicable only under certain conditions, is subject to exceptions, may not be used to create an ambiguity, and requires great caution in its application. 73 Am. Jur.2d, *Statutes,* sec. 212, at 405–06.

> [T]he rule is a rule of statutory construction and not a rule of law. Thus, it can be overcome by a strong indication of contrary legislative intent or policy. 2A *Sutherland Statutory Construction,* sec. 47.23, at 194 (Sands 4th ed. 1984 rev.).

> [T]he maxim is inapplicable if there is some special reason for mentioning one thing and none for mentioning another which is otherwise within the statute, so that the absence of any mention of such other will not exclude it. 82 C.J.S., *Statutes,* sec. 333, at 670.

> Several Latin maxims masquerade as rules of interpretation while doing nothing more than describing results reached by other means. The best example is probably *expressio unius est exclusio alterius,* which is a rather elaborate, mysterious sounding, and anachronistic way of describing the negative implication. Far from being a rule, it is not even lexicographically accurate, because it is simply not true, generally, that the mere express conferral of a right or privilege in one kind of situation implies the denial of the equivalent right or privilege in other kinds. Sometimes it does and sometimes it does not, and whether it does or does not depends on the particular circumstances of context. Without contextual support, therefore, there is not even a mild presumption here. Accordingly, this maxim is at best a description, after the fact, of what the court has discovered from context. R. Dickerson, *The Interpretation and Application of Statutes* 234–35 (1975).

pending law as applying to "interstate and foreign commerce," *id.* at 1, 2, without drawing any distinction between imports and exports.

Second, we note that the Federal Bill of Lading Act was passed to eliminate opportunities of irregularity and fraud with regard to the issuance of such bills, so as to encourage the advance of money to businesses by banks, with the bills as security. If banks could depend on the integrity of bills of lading, they could lend money on such instruments without fear of loss. *See id.* at 2–5; H.Rep. No. 847, 64th Cong., 1st Sess. 2–3 (1916). As the present case illustrates, fraud and confusion can occur in relation to bills of lading issued in foreign countries as well as in relation to bills of lading covering domestic shipments and exports. There is no indication in the legislative history that Congress intended only a partial solution to the problem it was attempting to solve. We think Congress intended the full solution.

Third, our inclination to interpret Section 81 as a partial, nonexclusive listing is buttressed by consideration of the general legal climate concerning the extent of congressional authority over interstate and foreign commerce in 1916, when section 81 was drafted and enacted. There was considerable debate and uncertainty in 1916 as to Congress's powers under the interstate commerce clause of the Constitution.[3] On the other hand, it was beyond dispute then, as now, that Congress had plenary powers to regulate the foreign commerce of the United States. *See, e.g., Henderson v. Mayor,* 92 U.S. (2 Otto) 259, 23 L.Ed. 543 (1875); *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824).

We think the legislative history shows that Congress wished the entire Act to

reach as far as it could reach constitutionally. The listing in section 81 was to emphasize that certain grey areas were definitely included. The absence of any mention of intrastate commerce or of imports is not a limitation of the categories of traffic covered but merely an implicit acknowledgement of Congress's undisputed power to reach all foreign commerce of the United States and its then presumed lack of authority to reach any purely intrastate transactions.

For the above reasons we question whether Congress meant to exclude bills of lading covering imports from the general purview of the Act. Nevertheless, even if section 81 were conceded to be an exhaustive listing and a limitation on the scope of the Act in general, the plain language of section 121 shows that section 81 was simply not meant to be limiting vis-a-vis section 121 in particular. Put differently, section 121 sets its own scope.

█ Assuming section 81 to be a limitation implies that there are other possible sorts of bills of lading that do not fall within the list set out in that section.[4] Furthermore, section 81 speaks only of "bills of lading *issued by any common carrier*" (emphasis added). The definitional section at the end of the Act defines the word "bill" as "bill of lading covered by this Act." Consequently, throughout the sections dealing with duplicate bills, bills issued in parts, liability, responsibility for goods and so forth, the FBLA speaks of "a bill" or "the bill" or "the bill of lading." In contrast, in section 121 the final substantive section of the Act, criminal penalties are imposed upon "*any* person" with regard to "*any* bill of lading" fraudulently

---

**3.** *See* S.Rep. No. 149, 64th Cong., 1st Sess., 5–9 (1916) (discussing constitutionality of pending law regulating bills of lading and concluding that as Congress can regulate instrumentalities of interstate commerce, so can it regulate the bills of lading as representatives and contracts of interstate business). We note that this discussion of constitutionality makes up over half of the Senate Report on the pending bill.

**4.** 49 U.S.C. sec. 81 reads:

Bills of lading issued by any common carrier for the transportation of goods in any Territory of the United States, or the District of Columbia, or from a place in a State to a place in a foreign country, or from a place in one State to a place in another State, or from a place in one State to a place in the same State through another State or foreign country, shall be governed by this chapter.

representing goods in intrastate or foreign commerce (emphasis added).

The scope of section 121 is thus broader than what is expressly set out in section 81. We think Congress intended "any" in section 121 to mean "every" and "all." *Cf. United States v. Kaercher*, 720 F.2d 5 (1st Cir.1983) (upholding conviction based on statute forbidding possession of controlled substance by U.S. citizen aboard "any vessel;" in accordance with nationality principle of international law, "any vessel" was not necessarily limited to U.S. vessel and could include foreign vessel). Accordingly, we hold that section 121, by its very language, intends to punish not only the fraudulent making or use of domestic and export bills of lading, but the fraudulent making or use of all bills of lading, not only by a common carrier or carrier's agent, but by "any person." [5]

Even if section 81 is a limiting section and the other provisions of the FBLA do not apply to bills of lading originating outside the United States, Congress intended to criminalize any act by any person that results in an intentionally false bill of lading. Any other understanding of section 121 would lead to results inconsistent with common sense. Someone negotiating forged, worthless bills of lading to a bank in this country would be subject to punishment for bills purportedly dealing with a fictitious shipment from Kansas to New York or New York to Berlin, yet could escape punishment under section 121 by concocting bills originating in a foreign country, for example, a bill purportedly dealing with shipments from Berlin to New York. Absent a clear command from Congress expressed in the words of the Act, we are unwilling to assume that Congress intended such an unreasonable result. *See United States v. Mendoza*, 565 F.2d 1285, 1288–89 (5th Cir.), *reh. granted*, 581 F.2d 89 (5th Cir.1978); *Government of Virgin Islands v. Berry*, 604 F.2d 221, 225 (3d Cir.1979); *see also Payne v. Panama Canal Co.*, 607 F.2d 155, 164 (5th Cir.1979) (holding that no part of a statute should be dismissed as mere surplusage but should be given the reasonable meaning it is presumed that Congress intended). Instead, the language of section 121 shows that Congress was aware of the incongruity that would result if criminal penalties applied only to domestic bills of lading. "Any" false bill of lading could endanger the financial dependability of all bills of lading; Congress therefore imposed a penalty to prevent "any" kind of fraudulent machinations.[6]

Our reading of section 121 of the FBLA is not a change in the law, and it can and

---

**5.** We acknowledge that international law may place some limitations upon Congress's power to reach extraterritorial acts. *See, e.g., FTC v. Compagnie de Saint–Gobain–Pont–a–Mousson*, 636 F.2d 1300, 1315–17 (D.C.Cir.1980) ("The two types of jurisdiction [prescriptive and enforcement] are not geographically coextensive—'[a] state having jurisdiction to prescribe a rule of law does not necessarily have jurisdiction to enforce it in all cases,' for unlike a state's prescriptive jurisdiction, which is not strictly limited by territorial boundaries, enforcement jurisdiction by and large continues to be strictly territorial.") This point, however, was not argued by defendant-appellant Duque. In any event, while the false bills of lading used by Duque dealt both with purported shipments between foreign countries and shipments from a foreign country to the United States, the bills themselves were used to defraud an American bank. This is enough.

**6.** We also note that the phrase "purporting to represent goods received for shipment among the several States or with foreign nations" of Section 121 was specifically added to prevent any dispute as to the constitutionality of that provision. *See* H.Rep. No. 847, 64th Cong., 1st Sess. 4 (1916) ("We deemed the criminal provision so important that we desired to leave no sort of doubt as to its constitutionality, so we have inserted by amendment the language proposed, making the section applicable to interstate and foreign commerce."). The very language of this amendment—"with foreign nations"—again strongly supports our reading of the statute to include bills of lading dealing with exports *and* imports; if Congress had only intended to reach exports, the term "to foreign nations" would have been the more accurate rendering of that idea. The preposition "with" signals the reciprocity envisioned by Congress, the to and fro movement of merchandise—that is, that the issuance of false bills of lading covering imports as well as exports is subject to punishment.

does apply to appellant Duque. Our reading does not unduly broaden the explicit words of the statute nor does it give to them a meaning that no reasonable person would foresee upon reading them.[7] The words of the Act, themselves, are sufficiently explicit and unambiguous to have put defendant on notice that he risked prosecution for his use of false bills of lading. Title 49 U.S.C. sec. 121 expressly imposes punishment for use of any false bills of lading purporting to represent goods shipped "among the several States or with foreign nations." In dealing with such false bills, appellant Duque took the risk that a court would reject his interpretation of 49 U.S.C. sec. 81 as limiting the reach of the criminal penalties imposed by section 121. We are aware of no opinion of any court that has held that prosecution under section 121 cannot reach false bills of lading originating abroad, purporting to represent goods shipped from abroad; there is therefore no law in this circuit or anywhere else upon which appellant Duque could reasonably rely.

For the above reasons, we therefore deny defendant Duque's motion for rehearing. We also withdraw the last two paragraphs on p. 1049 (including accompanying footnote 35) and the first complete paragraph on p. 1050 of our original opinion, *United States v. Castro*, 829 F.2d 1038, that is, the portion beginning "Section 81, however ..." and ending "... that affected the United States."

No member of this panel nor other Judge in regular active service on the court having requested that the court be polled on rehearing in banc, Duque's suggestion of rehearing in banc is denied.

7. *Compare Kordel v. United States*, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948) (affirming defendant's conviction, holding language forbidding drug misbranding by information "accompanying such article" to be applicable not only to information physically attached to drug container but also to information shipped or sold separately and at different times; a strained, restrictive reading of the language would defeat the legislative purpose of protecting consumers); *United States v. Gonzalez*, 776 F.2d 931, 938–41 (11th Cir.1985) (rejecting assertion that customs waters statute violated due process rights because persons aboard vessels did not know when waters around their vessel would be declared within customs enforcement area, thereby subjecting them to prosecution under U.S. drug laws; "Those embarking on voyages with holds laden with illicit narcotics, conduct which is contrary to laws of all reasonably developed legal systems, do so with the awareness of the risk that their government may consent to enforcement of the United States' laws against the vessel."); *United States v. Engler*, 806 F.2d 425, 433–36 (3d Cir.1986) (holding that strict liability provision of Migratory Bird Treaty Act did not violate due process by absence of scienter requirement; "The conduct and sale of species protected by the MBTA is not 'conduct that is wholly passive,' but more closely resembles conduct 'that one would hardly be surprised to learn ... is not innocent.'"), *cert. denied*, ––– U.S. –––, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987); *Knutson v. Brewer*, 619 F.2d 747, 749–51 (8th Cir.1980) (rejecting claim that state court's construction of statute prohibiting kidnapping for ransom violated due process rights of kidnapper, because he could not have known that sodomy, committed during kidnapping, would be construed as "thing of value;" "[Defendant] took the risk that the Supreme Court of Iowa would construe the statute as it did.... [The court] has simply given a common-sense interpretation to a phrase that was in the statute all along.") *with Bouie v. City of Columbia*, 378 U.S. 347, 362, 84 S.Ct. 1697, 1707, 12 L.Ed.2d 894 (1964) (state court's interpretation of criminal statute that forbade entry onto land after notice not to enter as including remaining on property after being asked to leave denied due process to defendants; "While such a construction is of course valid for the future, it may not be applied retroactively, any more than a legislative enactment may be, to impose criminal penalties for conduct committed at a time when it was not fairly stated to be criminal."); *Duke v. University of Texas at El Paso*, 663 F.2d 522 (5th Cir.1981) ("An interpretation of the word "benefit" broad enough to incorporate Dr. Duke's charges within the statute would clash with the policy of assuring fair warning of punishable conduct that underlies the rule of strict construction.").