### In re CHASE & SANBORN CORPORATION, Debtor.

### Paul C. NORDBERG, Creditor Trustee, Plaintiff–Appellant,

v.

### ARAB BANKING CORPORATION, Defendant–Appellee.

No. 89–5125.

United States Court of Appeals, Eleventh Circuit.

June 27, 1990.

David L. Katsky, Joel S. Weiss, Esanu, Katsky, Korins & Siger, New York City, Ronald G. Neiwirth, Miami, Fla., for plaintiff-appellant.

Alan G. Greer, Miami, Fla., Alan H. McLean, Hughes, Hubbard & Reed, New York City, for defendant-appellee.

Before KRAVITCH and JOHNSON, Circuit Judges, and KAUFMAN,* Senior District Judge.

JOHNSON, Circuit Judge:

Plaintiff Nordberg, the Creditor Trustee of Chapter 11 debtor Chase & Sanborn Corporation ("Chase & Sanborn"),[1] appeals from the district court's affirmance of the bankruptcy court's decision denying the Creditor Trustee's fraudulent conveyance and voidable preference claims against defendant Arab Banking Corporation ("ABC").[2]

## I. STATEMENT OF THE CASE

This case originates from one individual's "desperate, and ultimately unsuccessful, efforts to keep both his own and his family's overextended business empires afloat financially ... efforts [which] included obtaining falsely collateralized loans and engaging in insider bank fraud." *United States v. Castro [and Duque, et al.],* 829 F.2d 1038, 1039 (11th Cir.1987), *withdrawn in nonrelevant part and reh'g denied,* 837 F.2d 441 (11th Cir.1988). The result has been "a series of related financial transactions accurately described by the bankruptcy court as 'bewildering.'" *In re Chase & Sanborn Corp. (Nordberg v. Sanchez),* 813 F.2d 1177, 1179 (11th Cir.1987). The central character in this litigious brouhaha, which has by now produced its own extensive body of caselaw at every level of the federal judiciary,[3] is a rather remarkable

---

* Honorable Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation.

1. Chase & Sanborn has also done business under the name "General Coffee Corporation."

2. ABC is a multinational corporation organized under the laws of Bahrain and co-owned by the governments of Kuwait, Libya, and the Emirate of Abu Dhabi. It maintains branch offices in New York City and Houston.

3. Not counting the instant case, at least 51 published opinions have been spawned by the bankruptcy petitions, criminal prosecutions, and related federal legal proceedings arising from Duque's tangled affairs:

Supreme Court: *Granfinanciera, S.A. v. Nordberg,* —— U.S. ——, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989).

Court of Appeals: *In re Duque Rodriguez (General Electric Credit Corp. v. Murphy),* 895 F.2d 725 (11th Cir.1990); *Republic Nat'l Bank of Miami v. Fidelity and Deposit Co. of Maryland,* 894 F.2d 1255 (11th Cir.1990); *In re Chase & Sanborn Corp. (Granfinanciera, S.A. v. Nordberg),* 872 F.2d 397 (11th Cir.1989); *In re Chase & Sanborn Corp. (Nordberg v. Societe Generale),* 848 F.2d 1196 (11th Cir.1988); *United States v. Castro [and Duque, et al.],* 837 F.2d 441 (11th Cir.1988); *In re Chase & Sanborn Corp. (Nordberg v. Granfinanciera, S.A.),* 835 F.2d 1341 (11th Cir.1988), *rev'd,* 109 S.Ct. 2782 (1989); *United States v. Castro [and Duque, et al.],* 829 F.2d 1038 (11th Cir.1987), *withdrawn in part and reh'g denied,* 837 F.2d 441 (11th Cir.1988); *In re General Coffee Corp. (City Nat'l Bank of Miami v. General Coffee Corp.),* 828 F.2d 699 (11th Cir.1987), *cert. denied,* 485 U.S. 1007, 108

man by the name of Alberto Duque Rodriguez ("Duque"), a citizen of Colombia who developed a group of Miami-based enterprises revolving around the importation of coffee from his native land to the United States.

In the spring of 1982, Duque, then-owner of Chase & Sanborn and several other companies, and Camilo Bautista, then-president of Chase & Sanborn and an associate of Duque who held his power of attorney, sought a $22 million loan for Duque from ABC. They provided false financial statements to ABC in order to obtain the loan. During the loan negotiations, the senior official at ABC's New York City branch office, Samir Kaldawy, learned that Duque's business empire was in far more desperate straits than Duque alleged. Kaldawy thereafter accepted bribes totalling more than half a million dollars from Duque in return for recommending approval of the loan.[4] ABC loaned the $22 million to Duque in June 1982. The loan was secured by Duque's stock in City National Bank of Miami, which was then valued in excess of $22 million; the loan was also guaranteed by four companies controlled by Duque, including Chase & Sanborn. Chase & Sanborn received $369,288 in loan proceeds in

S.Ct. 1470, 99 L.Ed.2d 699 (1988); *In re Chase & Sanborn Corp. (Nordberg v. Sanchez)*, 813 F.2d 1177 (11th Cir.1987); *Shawmut Boston Int'l Banking Corp. v. Duque–Pena*, 767 F.2d 1504 (11th Cir.1985); *In re General Coffee Corp. (City Nat'l Bank of Miami v. General Coffee Corp.)*, 758 F.2d 1406 (11th Cir.1985).

District Court: *In re Colombian Coffee Co. (Metsch v. First Alabama Bank of Mobile)*, 75 B.R. 177 (S.D.Fla.1987); *In re General Coffee Corp. (City Nat'l Bank of Miami v. General Coffee Corp.)*, 64 B.R. 702 (S.D.Fla.1986), *aff'd*, 828 F.2d 699 (11th Cir.1987), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988); *In re Duque*, 48 B.R. 965 (S.D.Fla.1984); *Wright v. TRW Credit Data*, 588 F.Supp. 112 (S.D.Fla. 1984).

Bankruptcy Court: *In re Colombian Coffee Co.*, 88 B.R. 409 (Bkr.S.D.Fla.1988); *In re General Coffee Corp. (City Nat'l Bank of Miami v. General Coffee Corp.)*, 85 B.R. 905 (Bkr.S.D.Fla. 1988); *In re Duque Rodriguez*, 82 B.R. 610 (Bkr. S.D.Fla.1988); *In re Domino Investments, Ltd.*, 82 B.R. 608 (Bkr.S.D.Fla.1988); *In re Duque Rodriguez (Murphy v. Capital Bank)*, 77 B.R. 944 (Bkr.S.D.Fla.1987); *In re Duque Rodriguez (Murphy v. Meyer)*, 77 B.R. 942 (Bkr.S.D.Fla. 1987); *In re Duque Rodriguez (Murphy v. General Electric Credit of Tennessee)*, 77 B.R. 939 (Bkr.S.D.Fla.1987), *aff'd*, 895 F.2d 725 (11th Cir. 1990); *In re Duque Rodriguez (Murphy v. Avianca, Inc.)*, 77 B.R. 937 (Bkr.S.D.Fla.1987); *In re Duque Rodriguez (Murphy v. Valencia de Duque)*, 77 B.R. 936 (Bkr.S.D.Fla.1987); *In re Duque Rodriguez (Murphy v. City Nat'l Bank of Miami)*, 77 B.R. 933 (Bkr.S.D.Fla.1987); *In re Duque Rodriguez (Murphy v. Valencia)*, 75 B.R. 829 (Bkr.S.D.Fla.1987); *In re Colombian Coffee Co. (Metsch v. C. Itoh & Co.)*, 71 B.R. 258 (Bkr.S. D.Fla.), *aff'd*, 75 B.R. 177 (S.D.Fla.1987); *In re Chase & Sanborn Corp. (Nordberg v. Societe Generale)*, 68 B.R. 530 (Bkr.S.D.Fla.1986), *aff'd*, 848 F.2d 1196 (11th Cir.1988); *In re Colombian Coffee Co. (Metsch v. Republic Nat'l Bank of Miami)*, 66 B.R. 211 (Bkr.S.D.Fla.1986); *In re Colombian Coffee Co. (Metsch v. City Nat'l Bank of Miami)*, 64 B.R. 585 (Bkr.S.D.Fla.1986); *In re Colombian Coffee Co. (Metsch v. Arab Banking Corp.)*, 62 B.R. 542 (Bkr.S.D.Fla.1986); *In re Colombian Coffee Co. (Metsch v. First Alabama Bank of Mobile)*, 59 B.R. 643 (Bkr.S.D.Fla.1986); *In re Chase & Sanborn Corp. (Nordberg v. Grupo de Inversiones del Caribe, S.A.)*, 59 B.R. 7 (Bkr.S. D.Fla.1986), *aff'd in part and rev'd in part*, 64 B.R. 702 (S.D.Fla.1986), *aff'd*, 828 F.2d 699 (11th Cir.1987), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988); *In re Chase & Sanborn Corp. (Nordberg v. Granfinanciera, S.A.)*, 58 B.R. 721 (Bkr.S.D.Fla.1986); *In re Chase & Sanborn Corp. (Nordberg v. Nabisco Brands, Inc.)*, 55 B.R. 541 (Bkr.S.D.Fla.1985); *In re Chase & Sanborn Corp. (Nordberg v. Republic Nat'l Bank of Miami)*, 55 B.R. 538 (Bkr.S.D.Fla. 1985); *In re Chase & Sanborn Corp. (Nordberg v. Murphy)*, 55 B.R. 451 (Bkr.S.D.Fla.1985); *In re Chase & Sanborn Corp. (Nordberg v. New Orleans Public Service, Inc.)*, 55 B.R. 86 (Bkr.S.D. Fla.1985); *In re Chase & Sanborn Corp. (Nordberg v. Bank of Credit and Commerce Int'l)*, 54 B.R. 43 (Bkr.S.D.Fla.1985); *In re Chase & Sanborn Corp. (Nordberg v. Republic Nat'l Bank of Miami)*, 51 B.R. 739 (Bkr.S.D.Fla.1985); *In re Chase & Sanborn Corp. (Nordberg v. Wilcafe, Inc.)*, 51 B.R. 736 (Bkr.S.D.Fla.1985); *In re Chase & Sanborn Corp. (Nordberg v. Nationwide Trucking, Inc.)*, 51 B.R. 734 (Bkr.S.D.Fla.1985); *In re Chase & Sanborn Corp. (Nordberg v. Republic Nat'l Bank of Miami)*, 51 B.R. 733 (Bkr.S. D.Fla.1985); *In re General Coffee Corp. (City Nat'l Bank of Miami v. General Coffee Corp.)*, 41 B.R. 781 (Bkr.S.D.Fla.1984), *appeal transferred*, 758 F.2d 1406 (11th Cir.1985); *In re Duque Rodriguez (Shawmut Boston Int'l Banking Corp. v. Duque Rodriguez)*, 41 B.R. 774 (Bkr.S.D.Fla. 1984); *In re General Coffee Corp.*, 39 B.R. 7 (Bkr.S.D.Fla.1984); *In re Allsun Juices, Inc.*, 34 B.R. 162 (Bkr.M.D.Fla.1983); *In re Duque*, 33 B.R. 201 (Bkr.S.D.Fla.1983); *In re Duque*, 33 B.R. 199 (Bkr.S.D.Fla.1983), *vacated*, 48 B.R. 965 (S.D.Fla.1984); *In re General Coffee Corp. (Agritrade Corp. v. General Coffee Corp.)*, 32 B.R. 23 (Bkr.S.D.Fla.1983).

4. Kaldawy was murdered in 1988 after being indicted in connection with this bribery scheme.

return for its guarantee. Duque also opened a checking account at ABC, on which ABC frequently honored checks despite large overdrafts, thus effectively loaning Duque additional funds. After Duque failed to make the first loan payment as scheduled, Chase & Sanborn and other Duque-owned companies paid a total of $5 million on the $22 million principal through March 1983, but no further payments were made. Nevertheless, ABC loaned an additional $3.3 million to another Duque-owned company on March 21, 1983, and another $5 million directly to Duque on May 9, 1983. No payment on this latter total of $8.3 million was ever made.

On May 18, 1983, Chase & Sanborn filed for bankruptcy under Chapter 11 of the Bankruptcy Code, 11 U.S.C.A. §§ 1101–1174. Duque and Duque's other companies filed separately for bankruptcy at the same time. In 1984, the bankruptcy court denied a motion by several creditors for consolidation of the cases. Duque was later convicted of 62 fraud-related counts in connection with his financial dealings, and is currently imprisoned.[5] At issue in this case are Chase & Sanborn's June 1, 1982 guarantee of ABC's $22 million loan to Duque, and ten transfers from Chase & Sanborn to ABC, four involving payments applied to principal or interest on Duque's loan, and six involving payments applied to overdrafts which Duque incurred on his checking account with ABC. The four loan payments were as follows:

| 1. | October 1, 1982 | $ 918,194 | (applied to interest) |
| 2. | February 1, 1983 | 1,500,000 | (applied to principal) |
| 3. | March 3, 1983 | 400,000 | (applied to principal) |
| 4. | March 31, 1983 | 1,150,000 | (applied to principal) |

The six overdraft payments were as follows:

| 1. | October 8, 1982 | $ 440,212 |
| 2. | October 22, 1982 | 200,000 |
| 3. | December 15, 1982 | 685,745 |
| 4. | February 2, 1983 | 909,000 |
| 5. | February 15, 1983 | 1,000,000 |
| 6. | March 3, 1983 | 48,543 |

The Creditor Trustee alleges that the loan guarantee and all of the above transfers are voidable as fraudulent conveyances under 11 U.S.C.A. § 548(a)(2), because Chase & Sanborn received no "reasonably equivalent value in exchange."[6] The Creditor Trustee also alleges that the last two loan transfers, which occurred within 90 days of Chase & Sanborn's bankruptcy petition, are voidable preferences under 11 U.S.C.A. § 547.

The bankruptcy court dismissed the Creditor Trustee's complaint on September 19, 1986. *In re Chase & Sanborn Corp. (Nordberg v. Arab Banking Corp.),* No. 86–0493–BKC–TCB–A (Bkr.S.D.Fla. Sept. 19, 1986) (hereafter "Bkr.Ct.Op."). The court found that Chase & Sanborn was insolvent at all relevant times during the June 1982–March 1983 period, a necessary prerequisite for recovery under either the fraudulent conveyance or voidable preference theory. *See* Bkr.Ct.Op. at 2; 11 U.S.C.A. §§ 547(b)(3), 548(a)(2)(B)(i). As to the fraudulent conveyance issue, the court found that Chase & Sanborn had received "reasonably equivalent value" for the overdraft payments and for the loan guarantee. Bkr.Ct.Op. at 7, 11–12. As to the voidable preference issue, the court found that although the Creditor Trustee had otherwise established the statutory elements,[7] the transfers were not voidable because they

5. *See Castro [and Duque, et al.],* 829 F.2d at 1048–49 & n. 32 (affirming Duque's convictions). Bautista also went to prison in connection with these schemes.

6. The parties agree that the voidability of the four loan payments under § 548 hinges on the voidability of the loan guarantee. If the guarantee was valid, Chase & Sanborn received partial satisfaction of a valid debt for its payments on the loan; if it was invalid, the payments were obviously gratuitous.

7. The bankruptcy court found that the Creditor Trustee had established the § 547(b) statutory elements of a voidable preference claim with regard to all four of the loan payments, as well

as all of the overdraft payments. *See* Bkr.Ct.Op. at 4, 7–11. We are unsure of the bankruptcy court's reasoning with regard to the first two loan payments and the overdraft payments. As to the first two loan payments, because they were not made within 90 days of the bankruptcy petition, the Creditor Trustee would bear the burden of proving that the "creditor" "to or for the benefit of" whom the transfer was made was an "insider." *See* 11 U.S.C.A. § 547(b)(1), (b)(4)(B). It would seem that the relevant "creditor" in this case was ABC, not, as the bankruptcy court found, Duque. *Cf.* Bkr.Ct.Op. at 4–5. As the bankruptcy court noted, ABC was not an "insider." *Id.* at 5. As to the overdraft payments, they were not "for or on ac-

were "contemporaneous exchange[s] for new value" under section 547(c)(1). *Id.* at 4, 10–11. Finally, the court found that even if the transfers were voidable under either theory, Chase & Sanborn could not recover them from ABC because ABC was neither an "initial transferee" under 11 U.S.C.A. § 550(a)(1), nor a bad-faith "mediate transferee" under 11 U.S.C.A. § 550(a)(2), (b)(1). *Id.* at 4–5, 10–11.

The Creditor Trustee appealed to the district court, which affirmed the judgment of the bankruptcy court on December 29, 1988. *In re Chase & Sanborn Corp. (Nordberg v. Arab Banking Corp.)*, No. 86–2575–Civ–Scott (S.D.Fla. Dec. 29, 1988) (hereafter "Dist.Ct.Op.").[8] The Creditor Trustee appeals to this Court. ABC, while urging affirmance of the judgments below on the grounds relied on by the courts below, also contends that the Creditor Trustee's complaint should be dismissed on two alternative grounds asserted before the bankruptcy court and preserved on appeal before the district court and this Court. These alternative grounds for affirmance are discussed in Part II(D) below.[9]

## II. ANALYSIS

■■■ This case raises a number of important, if somewhat technical, questions concerning the interpretation and application of the Bankruptcy Code.[10] This Court's standard of review as to such issues of law is *de novo;* as to the bankruptcy court's findings of fact, "clearly erroneous" review applies. *In re Sublett,* 895 F.2d 1381, 1383 (11th Cir.1990). The bankruptcy court must make all necessary findings of fact; if the bankruptcy court's findings are "silent or ambiguous as to an outcome determinative factual question," remand to the bankruptcy court is required. *See id.* at 1384, *citing Wegner v. Grunewaldt,* 821 F.2d 1317, 1320 (8th Cir. 1987).

### A. The Fraudulent Conveyance Issue

■■■ It has long been established that "[w]hether fair consideration has been given for a transfer is 'largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts.'" *Mayo v. Pioneer Bank & Trust Co.,* 270 F.2d 823, 829–30 (5th Cir.1959) (Wisdom, J.), *cert. denied,* 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960).[11] The burden of proving lack of "reasonably equivalent val-

---

count of an antecedent debt" owed by Chase & Sanborn. *See* 11 U.S.C.A. § 547(b)(2). We need not concern ourselves with these issues, however, because the Creditor Trustee has abandoned, at least before this Court, any claim that the first two loan payments, or any of the overdraft payments, constitute voidable preferences.

**8.** This case was consolidated, at the district court level, with a bankruptcy appeal involving another former Duque-owned entity. *See In re Colombian Coffee Co. (Metsch v. Arab Banking Corp.),* No. 86–2234–Civ–Scott (S.D.Fla. Dec. 29, 1988). The appeal presently before this Court does not involve the latter case.

**9.** ABC also raised, in the bankruptcy court, a counterclaim against Chase & Sanborn in the amount of $11 million. The bankruptcy court, noting that there appeared to be no evidence supporting the claim, found it to be time-barred except as a possible offset to any recovery obtained by Chase & Sanborn. *See* Bkr.Ct.Op. at 13. Because the bankruptcy and district courts denied any recovery to Chase & Sanborn, neither court had occasion to discuss the counterclaim further. While ABC appears to have pre-

served the issue of the counterclaim on appeal before this Court, ABC has not explained the nature or basis of the claim before this Court, and we are not in a position to analyze its merits. We therefore leave any remaining issues involving the counterclaim to be resolved in the first instance by the bankruptcy court on remand.

**10.** A case arising from the multinational machinations and financial finaglings of an overambitious coffee magnate and his various corporate alter egos is perhaps not the best context in which to reflect upon the origins of modern bankruptcy law in the abuses and injustices of 19th-century British debtors' prisons, as chronicled so vividly by Charles Dickens. We may safely observe, however, in reflecting upon this case, that we are a long way from *Little Dorrit.*

**11.** Caselaw applying the concept of "fair consideration" under the old Bankruptcy Act of 1898 has been adopted as applicable to the concept of "reasonably equivalent value" under the current Bankruptcy Code of 1978. *See In re Duque Rodriguez (General Electric Credit Corp. v. Murphy),* 895 F.2d 725, 727 n. 2 (11th Cir.1990).

ue" under 11 U.S.C.A. § 548(a)(2)(A) rests on the trustee challenging the transfer. *In re Duque Rodriguez (General Electric Credit Corp. v. Murphy)*, 895 F.2d 725, 726 n. 1 (11th Cir.1990). The bankruptcy court found that most of the transfers from Chase & Sanborn to ABC paying off Duque's overdrafts were preceded, a few days before, by payments from Duque's account *to* Chase & Sanborn and other Duque-owned companies which created those overdrafts in the first place. While the Creditor Trustee disputes whether each individual overdraft transfer was balanced by a precisely equivalent prior transfer to Chase & Sanborn, there is evidence that the overall amount transferred to Chase & Sanborn from overdrafts on Duque's ABC account exceeded the amount transferred to the account by Chase & Sanborn in exchange. Under these circumstances, we find that the bankruptcy court's factual conclusion that the overdraft transfers were made for "reasonably equivalent value" is not clearly erroneous.[12]

■ As to Chase & Sanborn's guarantee of ABC's loan to Duque, the Creditor Trustee contends that the $369,288 in loan proceeds received by Chase & Sanborn in exchange for the guarantee did not constitute "reasonably equivalent value." The Creditor Trustee argues principally that this amount was far less than the loan principal and the amounts actually paid by Chase & Sanborn on the loan. It is well established, however, that a contingent liability cannot be valued at its potential face amount; rather, "it is necessary to discount it by the probability that the contingency will occur and the liability become real." *Matter of Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir.1988). The bankruptcy court found that, in view of the fact that the loan was more than adequate-

12. While not explicitly approving or rejecting the reasoning of the bankruptcy court, the district court relied on a different rationale to conclude that Chase & Sanborn had received "reasonably equivalent value" for the overdraft transfers. The district court found that because Duque owned and controlled Chase & Sanborn, the benefit received by Duque in having his overdrafts paid off was properly chargeable to Chase & Sanborn. *See* Dist.Ct.Op. at 11–12. This theory is difficult to reconcile with the bankruptcy court's original refusal to consolidate Chase & Sanborn's bankruptcy proceeding with those of Duque and his other wholly-owned entities, and Chase & Sanborn's subsequent treatment as a separate debtor. *See* Bkr. Ct.Op. at 12–13 (rejecting ABC's attempt to re-open original denial of consolidation).

The district court cited a case in which the bankruptcy court below found that Duque "comingled the credit and assets of [Chase & Sanborn and the other entities he controlled] ... and used those assets to serve his individual purpose.... Each entity was, therefore, an alter ego of Duque." *In re Chase & Sanborn Corp. (Nordberg v. Murphy)*, 55 B.R. 451, 454 (Bkr.S.D. Fla.1985) ("*Murphy*"). *Murphy* held, however, that Duque's inequitable conduct and closeness to Chase & Sanborn made him responsible for the inadequate state of Chase & Sanborn's records, and that the unfair advantage this conferred on Duque required equitable subordination of his claims against Chase & Sanborn to those of Chase & Sanborn's unaffiliated creditors. *See id.* We agree with the Creditor Trustee that the district court's reliance on *Murphy* to charge Chase & Sanborn with responsibility for Duque's debts "turns that case on its head." The

district court also relied on another case involving Chase & Sanborn which noted in dicta that "when the debtor making an allegedly fraudulent transfer is closely related to the party benefitting from the transfer, courts have often found reasonably equivalent value based simply on the benefit to the latter party." *In re Chase & Sanborn Corp. (Nordberg v. Societe Generale)*, 848 F.2d 1196, 1199 n. 7 (11th Cir.1988) ("*Societe Generale*"). *Societe Generale* relied, however, on yet another Duque-related case, involving a payment by Duque himself on behalf of one of his wholly-owned companies, which held that the "alter ego" theory does not apply where the related third-party beneficiary is itself terminally insolvent, and where the payment to the related beneficiary diminished the net worth of the debtor and thus harmed the debtor's innocent creditors. *See In re Duque Rodriguez (Murphy v. Avianca, Inc.)*, 77 B.R. 937, 939 (Bkr.S.D. Fla.1987). This is precisely the situation in the present case, where Duque was terminally insolvent at the time Chase & Sanborn paid off the overdrafts on his behalf.

Finally, we note that the district court's reliance on its alternative theory was inappropriate because the bankruptcy court made no specific findings of fact *in this case*, as to the interconnection or commingling of identity or control between Duque and Chase & Sanborn, which might support the district court's theory. *See Sublett*, 895 F.2d at 1384. Indeed, the bankruptcy court's reaffirmance of its refusal to consolidate this case with the other Duque-related bankruptcies suggests the contrary.

For these reasons, we decline to rely on the reasoning of the district court on this issue, and adopt instead that of the bankruptcy court.

ly secured by Duque's City National Bank stock, and that the loan was co-guaranteed by other Duque-owned entities, the $369,288 payment to Chase & Sanborn was, at the time, a reasonably discounted equivalent to Chase & Sanborn's contingent liability. *See* Bkr.Ct.Op. at 11–12. This factual finding is not clearly erroneous.[13]

For these reasons, we conclude that there is no basis for reversing the judgments below on the fraudulent conveyance issue.

### B. *The Voidable Preference Issue*

■ As noted above in Part I, the bankruptcy court found that the Creditor Trustee had established the statutory elements under section 547(b) as to the two loan payments which the Creditor Trustee contends are voidable. *See* Bkr.Ct.Op. at 4, 10–11. This finding was affirmed by the district court. *See* Dist.Ct.Op. at 12–13 & n. 8. ABC argues, however, that Chase & Sanborn's loan payments were not "for or on account of an antecedent debt" under section 547(b)(2) because Chase & Sanborn's guarantee obligation to ABC was contingent upon Duque's default and had not "matured" at the time the payments were made.[14] This contention is frivolous. It is established that "debt" is to be given a broad and expansive reading for purposes of the Bankruptcy Code, and that "when a creditor has a claim against a debtor—*even if the claim is unliquidated, unfixed, or contingent*—the debtor has incurred a debt to the creditor." *In re Energy Cooperative, Inc.,* 832 F.2d 997, 1001 (7th Cir. 1987) (emphasis added). Chase & Sanborn's payments on Duque's loan were obviously made in anticipatory satisfaction of its contingent obligation to ABC under the guarantee agreement; that the payments were clearly intended to help *prevent* Duque from defaulting and thereby *forestall* "maturation" of the guarantee obligation does not render them any less "for or on account of" that debt.

■ The bankruptcy court found that Chase & Sanborn's payments on Duque's loan obligation were nevertheless not voidable under 11 U.S.C.A. § 547(c)(1), because Chase & Sanborn received contemporaneous "new value" in exchange for the payments, in the form of partial satisfaction of Chase & Sanborn's guarantee obligation.[15] The bankruptcy court held, without discussion or analysis, that "[n]ew value includes credit toward an outstanding and nonavoidable account." Bkr.Ct.Op. at 4 (citing 11 U.S.C.A. § 547(a)(2)). This holding is erroneous as a matter of law, and suggests a fundamental misconception of the nature and purpose of the Bankruptcy Code's prohibition on preferential pre-petition transfers. "New value" is defined as

> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation[.]

11 U.S.C.A. § 547(a)(2) (West Supp.1990). "Credit toward an outstanding and nonavoidable account" does not fall within this definition. That a payment be "for or on account of an antecedent debt" is one of

---

13. The Creditor Trustee also argues, rather brazenly, that Chase & Sanborn did not receive "reasonably equivalent value" for the loan guarantee because it expended far more than $369,288 in the bribes paid to Kaldawy at Duque's direction. It would hardly be equitable to ABC, however, to avoid the loan guarantee because Duque used Chase & Sanborn funds to bribe an ABC official into defrauding ABC in order to obtain the loan in the first place.

14. As ABC notes, Duque did not technically default on his obligation to ABC in early 1983, but obtained a "restructuring" of his debt, and even

received additional loans from ABC in March and May of 1983.

15. It should be noted that while the trustee-plaintiff bears the burden of proving the elements of avoidability under § 547(b), the creditor-transferee bears the burden of establishing any of the affirmative defenses under § 547(c). *See* 11 U.S.C.A. § 547(g) (West Supp.1990); *see also In re Jet Florida Systems, Inc.,* 861 F.2d 1555, 1559 (11th Cir.1988) ("creditor must ... prove the specific valuation of the ['new value'] that the debtor received ... in the contemporaneous exchange").

the necessary elements for *voidability* of a transfer under section 547. *See* 11 U.S.C.A. § 547(b)(2). If "new value" included credit toward such debts, thus rendering such transfers categorically *nonavoidable*, section 547 would be rendered a tautological nullity. *See, e.g., In re Air Conditioning, Inc. of Stuart*, 845 F.2d 293, 298 (11th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988); *Energy Cooperative*, 832 F.2d at 1002–03.

The district court reached the same conclusion as the bankruptcy court on the basis of *In re Dick Henley, Inc. (LaRose v. Crosby & Son Towing, Inc.)*, 38 B.R. 210 (Bkr.M.D.La.1984) ("*LaRose*"). *See* Dist. Ct.Op. at 13–14; *see also Matter of Advanced Contractors (Cooley v. General Elevator Corp.)*, 44 B.R. 239 (Bkr.M.D.Fla. 1984) ("*Cooley*") (following *LaRose*). *LaRose* and *Cooley* each involved debtor-contractors who made preferential pre-petition payments to subcontractors on debts arising from construction contracts. The subcontractors in each case had perfected liens on the properties of the third-party owners of the construction sites, and the owners in turn had unsecured rights of indemnification regarding such liens against the debtor-contractors. *LaRose* and *Cooley* found the debtor-contractors' payments to the subcontractors to be exchanged for "new value" in the form of the subcontractors' release of the liens against the owners and the consequent "constructive release" of the owners' rights of indemnification against the debtor-contractors. *See LaRose*, 38 B.R. at 213–14; *Cooley*, 44 B.R. at 241–42.

We find the analogy to *LaRose* rather weak.[16] In any event, it is apparent that *LaRose*'s reasoning constitutes a circular and ill-founded evasion of the policy against preferential transfers. If the debtor-contractors in *LaRose* and *Cooley* had not made the payments to the subcontrac-

tors, the subcontractors would presumably have foreclosed their liens on the owners and the owners would then have asserted their unsecured rights of indemnification against the debtor-contractors. Thus, by making the payments, the debtor-contractors gained nothing more than release of a contingent obligation—an antecedent debt—owed to an unsecured creditor. For reasons discussed above, such a release cannot constitute "new value" under section 547. The present Fifth Circuit recognized the infirmity of *LaRose* in *Matter of Fuel Oil Supply & Terminaling, Inc. (Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc.)*, 837 F.2d 224, 230 (5th Cir.1988) ("*Gulf Oil*"). *Gulf Oil* held that "the principle underlying § 547(c)(1) was offended by the [*LaRose*] court's holding because the released right of indemnity provided nothing of tangible value to the debtor's estate. Therefore, the estate was depleted by the debtor's payment to the detriment of the unsecured creditors." *Id.* The court noted that

> [*LaRose*] essentially held that any time a debtor makes a pre-bankruptcy transfer to a creditor whose debt is guaranteed by a third party, there is no preference because the release of the debtor from contingent liability to the guarantor would constitute new value. This holding vitiates the purpose of the preference section.

*Id.* at 230 n. 17. We agree fully with the Fifth Circuit's reasoning in *Gulf Oil* on this issue, and we therefore reject *LaRose* and *Cooley*.[17]

■ Finally, the district court held, and ABC argues, that Chase & Sanborn received "new value" for the loan payments in the form of certain rights of subrogation, reimbursement, indemnification, and contribution which Chase & Sanborn possessed under the guarantee agreement and

---

16. Chase & Sanborn's payments on Duque's debt to ABC did not effect any release, by ABC or any other entity, of any obligation owed by Chase & Sanborn, other than reducing Chase & Sanborn's contingent guarantee obligation to ABC, the very "antecedent debt" "for or on account of" which Chase & Sanborn made the payments in the first place.

17. We note that *LaRose* has also been rejected by *In re Hatfield Electric Co.*, 91 B.R. 782, 785–86 (Bkr.N.D.Ohio 1988), and *In re H & S Transportation Co.*, 80 B.R. 441, 447 (Bkr.M.D.Tenn. 1987).

which matured upon Chase & Sanborn's partial payment of Duque's debt.[18] While such contingent rights may have *value*, however, *see, e.g., Matter of Ollag Construction Equipment Corp.*, 578 F.2d 904, 908 (2d Cir.1978), they could not be said to constitute *new* value received in exchange for Chase & Sanborn's loan payments. Any rights existing under the guarantee agreement were part and parcel of that agreement from the outset. They came into existence as contingent rights at the same time as did the contingent obligation represented by the guarantee itself; thus, they simply defined the nature and extent of that obligation. Treating the maturation of such contingent rights as "new value" would disserve the policies underlying section 547, because a debtor's preferential payment of actual monetary value to a creditor under a guarantee agreement, in return for nothing more than the pre-existing right to assert a claim for reimbursement against the party whose debt was guaranteed,[19] depletes the tangible assets of the estate to the detriment of the other creditors.[20]

For the foregoing reasons, we conclude that the March 3 and March 31, 1983 loan payments by Chase & Sanborn are voidable preferences under section 547.

## C. The Initial Transferee Issue

The courts below found that even if any of the disputed transfers were avoidable, they were not recoverable from ABC because ABC was not "the initial transferee of such transfer or the entity for whose benefit such transfer was made." 11 U.S.C.A. § 550(a)(1). They concluded that Duque, not ABC, was the "initial transferee" because of Duque's control over Chase & Sanborn's actions in transferring the payments to ABC. *See* Dist.Ct.Op. at 14–17.[21] The district court's reasoning on the initial transferee issue constitutes a misapplication of the governing "control test" enunciated by this Court in *In re Chase & Sanborn Corp. (Nordberg v. Societe Generale)*, 848 F.2d 1196 (11th Cir. 1988) ("*Societe Generale*").[22]

---

**18.** ABC also contends that Chase & Sanborn received post-transfer "new value" under § 547(c)(4). Neither of the courts below discussed or relied upon such a theory and we find no merit in it.

**19.** The right of reimbursement is likely to be of especially dubious value in such situations, given that payment under the guarantee agreement would not be necessary unless the party whose debt is guaranteed is in default or in danger of default.

**20.** Furthermore, we note that the bankruptcy court did not rely on any such theory, and stated no factual findings which might support it. The district court thus erred in any event by considering this theory in the first instance. *See Sublett*, 895 F.2d at 1384.

**21.** The bankruptcy court presumably relied upon reasoning similar to that of the district court; its finding on the initial transferee issue was not accompanied by any significant analysis. *See* Bkr.Ct.Op. at 4. We note that the bankruptcy court, unlike the district court, did not have the benefit of the caselaw primarily relied upon in the text.

**22.** The Creditor Trustee, while arguing primarily that ABC was the "initial transferee" of the disputed transfers, also contends that ABC was "the entity for whose benefit [the] transfer[s]

w[ere] made." The Seventh Circuit has noted that the intended scope of the latter statutory language—and the overlap, if any, between "initial transferee" and "beneficiary entities"—is unclear from the legislative history of the Bankruptcy Code. *See Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 896 (7th Cir.1988). It might seem that because ABC ultimately got the money transferred by Chase & Sanborn, it was necessarily the "beneficiary entity" under section 550(a)(1). The Seventh Circuit in *Bonded*, however, concluded that the structure of section 550 requires that "initial transferees" and "beneficiary entities" be treated as mutually exclusive categories, and that "§ 550 distinguishes transferees (those who receive the money or other property) from entities that get a benefit because someone else received the money or property." *Id. Bonded* held that "[t]he paradigm 'entity for whose benefit such transfer was made' is a guarantor or debtor—someone who receives the benefit but not the money." *Id.* at 895; *see also In re Columbia Data Products, Inc.*, 892 F.2d 26, 29 (4th Cir. 1989) ("When a debtor pays a creditor to satisfy a debt guaranteed by a third party, the creditor is the initial transferee and the guarantor, who is no longer liable for the debt, is the entity for whose benefit the transfer is made.") (citing *Bonded*). As applied to this case, where Chase & Sanborn, the guarantor, paid the creditor, ABC, in partial satisfaction of Duque's debt, the reasoning of *Bonded* and *Columbia Data* would

The term "control test" and the "general framework for analysis" adopted by *Societe Generale* are taken from this Court's opinion in *In re Chase & Sanborn (Nordberg v. Sanchez)*, 813 F.2d 1177 (11th Cir. 1987) ("*Sanchez*").[23] *See Societe Generale*, 848 F.2d at 1199. It is important to emphasize, however, that *Sanchez* dealt with an issue different from that addressed in *Societe Generale*. *Sanchez* applied its "control test" to analyze whether certain funds transferred by Chase & Sanborn to the defendant in that case were in fact "property of the debtor" under 11 U.S.C.A. § 548(a), or were under the actual control of Duque. On the facts of *Sanchez*, involving a "two-day layover" of funds in a Chase & Sanborn account which had only recently been opened and was closed soon thereafter, this Court found that "Duque, not Chase & Sanborn, controlled the transfer at issue." *Sanchez*, 813 F.2d at 1182.

In this case, by contrast, both courts below either explicitly or implicitly found, and ABC does not contest on appeal, that Chase & Sanborn exercised sufficient control over the transferred funds at issue to satisfy the "property of the debtor" prerequisites of both sections 547(b) and 548(a). Thus, while *Sanchez* involved the degree of "control" over transferred funds exercised by the *transferor*, *Societe Generale* addressed the distinct issue of the *transferee's* control over such funds. *See Societe Generale*, 848 F.2d at 1199 ("[T]he general approach outlined in [*Sanchez*] applies regardless of whether a court is attempting to determine whether a debtor controlled the transferred funds it transfer-

red to a defendant *or* a defendant gained control over the funds transferred to it.") (emphasis in original). Thus, the extent of Duque's control over Chase & Sanborn generally, and over Chase & Sanborn's actions in transferring the disputed funds to ABC in particular, is entirely irrelevant to the "initial transferee" issue. The relevant issue is *ABC's* control over the funds, vis-a-vis Duque, Chase & Sanborn, or anyone else, when they arrived at ABC. *See Societe Generale*, 848 F.2d at 1200 (stating issue as "whether the banks actually controlled the funds or merely served as *conduits*, holding money that was in fact controlled by either the transferor or the real transferee") (emphasis added); *see also In re Columbia Data Products, Inc.*, 892 F.2d 26, 28 (4th Cir.1989) ("a party cannot be an initial transferee if he is a mere conduit for the party who had a direct business relationship with the debtor"). We suggest that *Societe Generale's* test might better be labeled a "conduit test" in order to distinguish it from the "control test" as applied in *Sanchez*.

> *Societe Generale* held that
> where a bank receives money from a debtor to pay off a debt owed to the bank, courts have found that the bank gained control of the funds and have allowed recovery against the bank. When banks receive money for the sole purpose of depositing it into a customer's account, on the other hand, the bank never has actual control of the funds and is not a section 550 initial transferee.

*Id.* (citations omitted); *see also Columbia Data*, 892 F.2d at 28 ("When a creditor

indicate that ABC was the initial transferee and Duque the beneficiary entity. Thus, the courts below may well have been correct in finding that ABC was not "the entity for whose benefit" Chase & Sanborn made the disputed transfers. *See* Bkr.Ct.Op. at 4; Dist.Ct.Op. at 15. While we find the Seventh Circuit's reasoning in *Bonded* thoughtful and quite possibly correct, we do not venture to decide this issue in this case. Because, as discussed in the text, we conclude that ABC was the initial transferee of Chase & Sanborn's last two loan payments, we need not reach the question whether ABC was also the beneficiary entity under section 550(a)(1).

23. As readers of this opinion will have doubtless observed, the litigation generated by Duque's travails has taken on somewhat alarming prop-

erties of parthenogenesis. Somewhat like a self-reproducing organism feeding on its own progeny, this litigation has generated both an ever-increasing number of disputes requiring resolution by the courts and, at the same time, much of the caselaw necessary to resolve those disputes. However ill-starred the fruits of Duque's business ventures, it must be said that he has produced a body of decisional law in the bankruptcy field which will guide the bench and bar for years to come. *See* note 3, *supra; see also* Andrew P. Gold, *The Strong Arm Clause Outmuscles the Constructive Trust—In re General Coffee Corp.: City National Bank of Miami v. General Coffee Corp.*, 39 U. Miami L.Rev. 757 (1985) (student casenote on *General Coffee*, 41 B.R. 781 (Bkr.S.D.Fla.1984), *appeal transferred*, 758 F.2d 1406 (11th Cir.1985)).

receives money from its debtor to pay a debt, the creditor is not a mere conduit."). *Societe Generale* relied in part on Judge Easterbrook's scholarly opinion for the Seventh Circuit in *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir.1988), in which the court declined to find a bank an initial transferee where the bank deposited a check into a party's account and the party, ten days later, authorized the bank to debit the account to pay a pre-existing debt owed by the party to the bank. *See Bonded*, 838 F.2d at 893–94. *Bonded* held, however, that if the check had been specifically earmarked for immediate use in paying the party's debt to the bank, the bank would have been the initial transferee. *Bonded*, 838 F.2d at 892; *see also Societe Generale*, 848 F.2d at 1200 (citing *Bonded* on this point). *Societe Generale* held that if the one-day "paper overdraft"[24] at issue in that case had

> constituted a *debt* owed to [the bank] ... then the money wired to [the bank]—for

the express purpose of paying off the overdraft—would actually have been sent to [the bank]. If [that were] the case, then [the bank] had actual control of the funds when it received the money from Chase & Sanborn, and [Creditor Trustee] Nordberg can recover the money from the bank.

*Id.* at 1200–01 (emphasis in original).

Applying these principles to the facts of this case, it is clear that ABC was the initial transferee of Chase & Sanborn's last two loan payments. The bankruptcy court found that the March 3, 1983 transfer was sent directly to ABC with specific instructions to apply the $400,000 to Duque's loan principal, and that ABC followed those instructions.[25] Bkr.Ct.Op. at 10. The bankruptcy court found that the March 31, 1983 transfer was wired "from an account of [Chase & Sanborn] to Duque's account [at ABC] with directions that it be applied to Duque's $22 million note. The directions were followed." Bkr.Ct.Op. at 11.[26] Thus, ABC exercised control over the funds im-

---

24. *Societe Generale* involved a transfer by Chase & Sanborn, the same debtor involved in this case, to the defendant bank in that case, Societe Generale, to pay off an overdraft incurred by another Duque-owned company, the Colombian Coffee Company, which had an account at Societe Generale. The overdraft occurred when Societe Generale honored a check written by Colombian Coffee to another bank; the account had insufficient funds at the time, but Societe Generale had received confirmation that funds sufficient to cover the check were being wired to Colombian Coffee's account. The disputed transfer from Chase & Sanborn constituted part of the wired funds. *See Societe Generale*, 848 F.2d at 1198. Because the entire transaction was "effectively simultaneous," this Court found that "no real debtor-creditor relationship" had ever developed between Societe Generale and Colombian Coffee, and that Societe Generale had functioned merely as a "conduit" for Chase & Sanborn's payment to Colombian Coffee to cover the latter's check. This Court therefore concluded that Societe Generale could not be held liable as the initial transferee under section 550. *See id.* at 1201. This aspect of *Societe Generale*'s holding has no relevance to our disposition of the initial transferee issue in this case. Because we have already concluded that Chase & Sanborn's disputed overdraft payments in this case are not avoidable, *see* Part II(A) above, we do not reach the initial transferee issue as to those transfers. With regard to the last two loan payments by Chase & Sanborn, it

is clear, as discussed in Part II(B) above, that those transfers constituted payments on a debt owed to ABC.

25. This transfer was in the form of a check for $500,000 payable to Duque, $400,000 of which was applied by ABC to pay off part of Duque's loan, $48,543 of which was applied to pay off an overdraft on Duque's account, and the remainder of which was deposited in Duque's account. The bankruptcy court stated: "The check was deposited with [ABC] which collected the funds and applied $400,000 to the principal of the $22 million loan and credited the remainder to Duque's account, which at that moment had a negative balance of $48,543." Bkr.Ct.Op. at 10. This suggests that the $400,000 never even passed through Duque's account. The Creditor Trustee contends that this was in fact the case; based on our review of the record, we agree and conclude that any other conclusion by the bankruptcy court would have been clearly erroneous.

26. The *Creditor Trustee* contends that although this wire transfer was accompanied by instructions to deposit the $1,150,000 in Duque's account before applying the funds to Duque's loan, ABC disregarded those instructions and applied the funds directly to the loan principal. The record supports this contention. To the extent that the bankruptcy court's stated finding might be read to suggest that the March 31 transfer passed through Duque's account at

mediately upon receiving them, and applied them to reduce a debt owed to ABC; neither Duque nor any other party exercised any control over the funds after they left Chase & Sanborn. There was no interregnum, as in *Bonded,* during which the funds sat in Duque's account subject to his use or control; indeed, the two transfers at issue did not pass even momentarily through Duque's account. *See* notes 25 & 26, *supra.* Substituting the names of the relevant parties in this case for the equivalent parties involved in *Bonded,* the Seventh Circuit in *Bonded* held:

> If the note accompanying [Chase & Sanborn's] check had said: "use this check to reduce [Duque's] loan" instead of "deposit this check into [Duque's] account," § 550(a)(1) would provide a ready answer. [ABC] would be the "initial transferee" and [Duque] would be the "entity for whose benefit [the] transfer was made." [27] The [Creditor Trustee] could recover the [transfer] from [ABC], [Duque], or both, subject to the rule of § 550(c) that there may be but one recovery.

*Bonded,* 838 F.2d at 892 (footnote added). This case is thus precisely analogous to the hypothetical envisioned by *Bonded;* just as in *Societe Generale,* the transfers at issue here were sent "for the express purpose of paying off" part of Duque's debt. *See Societe Generale,* 848 F.2d at 1200–01.[28]

For these reasons, we conclude that the March 3 and March 31, 1983 loan payments by Chase & Sanborn are both voidable and recoverable from ABC.

### D.   *ABC's Alternative Grounds for Affirmance*

■ Regardless of the foregoing conclusions, ABC contends that the Creditor

Trustee's recovery claims must be dismissed, and the judgments below affirmed, on the ground that Chase & Sanborn was not in fact insolvent during the relevant time period, as required by 11 U.S.C.A. §§ 547(b)(3) and 548(a)(2)(B)(i). This contention lacks merit. The bankruptcy court's contrary factual conclusion, *see* Bkr.Ct.Op. at 2, is more than amply supported by the record and is therefore not clearly erroneous. ABC also contends that any recovery by the Creditor Trustee is equitably barred because of fraudulent conduct by Chase & Sanborn toward ABC, in concert with Duque. This contention also lacks merit. The Creditor Trustee represents the creditors of Chase & Sanborn, and his claims are brought for their benefit; those claims cannot be barred because of any pre-bankruptcy frauds committed by Chase & Sanborn. *See In re Davis,* 785 F.2d 926, 927 (11th Cir.1986).

### III.   CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court on the fraudulent conveyance issue, although for the reasons stated by the bankruptcy court and not those stated by the district court. *See* note 12, *supra.* As to the March 3 and March 31, 1983 loan payments, with regard to the voidable preference and initial transferee issues, we REVERSE and REMAND with instructions to REVERSE the judgment of the bankruptcy court on those issues and REMAND the case for further proceedings consistent with this opinion.

---

ABC, that finding is clearly erroneous. Whether the transfer passed momentarily through Duque's account is not dispositive to our analysis, however; the crucial factor is that ABC exercised immediate effective control over the funds, and applied them, as instructed, to Duque's loan principal.

**27.**   *See* note 22, *supra.*

**28.**   *Societe Generale* found that the bank in that case was not the initial transferee for reasons

unrelated to the issue in this case. *See* note 24, *supra.*

The Creditor Trustee contends that even if ABC were not the "initial transferee" under § 550(a)(1), it did not act in good faith as the "mediate transferee" under § 550(a)(2), (b)(1), and is thus subject to recovery. Because we conclude that ABC was the initial transferee, we need not reach this issue. We note, however, that the bankruptcy court's factual finding that ABC acted in good faith, *see* Bkr.Ct.Op. at 5, does not appear to be clearly erroneous.