**In re JOTAN, INC. and Southland Container Packaging Co., Debtors.**

**Gordon P. Jones, Chapter 7 Trustee, Plaintiff,**

v.

**Ryder Integrated Logistics, Inc., Defendant.**

**Bankruptcy No. 98–9633–3F7. Adversary No. 00–251.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

July 10, 2001.

Ronald Bergwerk, Jacksonville, FL, for Plaintiff.

Joseph Steinfeld, Eagan, MN, for Defendant.

Alan M. Weiss, Jacksonville, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This Proceeding is before the Court on the Complaint to recover money or property filed by Gordon P. Jones ("Plaintiff"), Chapter 7 Trustee for Jotan, Inc. and Southland Container Packaging Co. (together "Debtors"), on August 31, 2000. (Adv.Doc. 1.) Ryder Integrated Logistics, Inc. ("Defendant") filed an Answer to the Complaint on September 29, 2000. (Doc. 5.) On February 27, 2001, Defendant filed an Amended Answer to the Complaint. (Doc. 15.) On April 3, 2001, the Court held a trial and took the matter under advisement. Upon review of the evidence entered at trial and upon review of the arguments and submissions of counsel, the Court enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

On April 20, 1992, Debtor Southland Container Packaging Co. ("Southland") and Ryder Distribution Resources, Inc. ("RDR"), predecessor to Defendant, entered into a three-year Transportation Agreement ("the first agreement"). (Def.Ex. 28.) Southland agreed to compensate RDR for providing Southland with two leased tractors and two drivers to service Southland's Orlando, Florida location. The first agreement provided for sixty-day written notice of termination. The first agreement also provided that, in

the event of default by Southland, RDR could exercise an option to obligate Southland to purchase the vehicles leased to Southland for their original value minus preset monthly depreciation ("the equipment purchase obligation"). The first agreement provided for a fixed weekly charge of $1,572.52, plus $.433 per mile driven and fuel charges. By letter of May 11, 1995, Debtor agreed to pay Defendant $11.64 per stop for some stops made by the leased tractors and $7.63 per stop for certain other stops made by the tractors. The first agreement did not provide for an original value for the tractors leased in Orlando.[1] Southland later agreed to pay a higher weekly rate of $1,590.02 in exchange for the use of a second sleeper tractor. Defendant invoiced Southland weekly for services rendered under the first agreement, and Southland paid Defendant weekly with a company check.

On February 3, 1995, Southland and Defendant entered into a second Transportation Agreement ("the second agreement") for the use of two tractors and drivers to service Southland's Winchester, Massachusetts location. (Def.Ex. 29.) The terms of the second agreement were identical to those of the first agreement, except that Southland agreed to pay a fixed weekly charge of $1,299.03 and a mileage charge of $.589 plus fuel charges. Southland agreed to pay Defendant $12.57 per stop. According to Schedule A of the second agreement, the two tractors leased to Southland in Winchester had an original value of $56,193.00 each and depreciated at a rate of $475.00 per month.

On March 14, 1995, Southland and Defendant entered into a third Transporta-tion Agreement ("the third agreement") for the use of one tractor and one driver to service Southland's Syracuse, New York location. (Def.Ex. 30.) The terms of the third agreement were identical to the terms of the second agreement, except that Southland agreed to pay a fixed weekly charge of $1,103.10 and a mileage charge of $.703 plus fuel charges. Southland agreed to pay Defendant $13.96 per stop. According to Schedule A of the third agreement, the tractor leased to Southland in Syracuse had an original value of $56,193.00 and depreciated at a rate of $475.00 per month.

On July 28, 1995, Southland and Defendant entered into a fourth Transportation Agreement ("the fourth agreement") for the use of three tractors, two straight trucks and five drivers to service Southland's Edison, New Jersey location. (Def.Ex. 31.) The terms of the fourth agreement were identical to the terms of the second and third agreements, except that Southland agreed to pay Defendant a fixed weekly charge of $3,906.69 and a mileage charge of $.681 plus fuel charges. Southland agreed to pay Defendant $16.87 per stop. According to Schedule A of the fourth agreement, the three tractors leased to Southland had an original value of $48,086.00 each and depreciated at a rate of $488.06 per month. The two "dry vans" leased to Southland in Edison had an original value of $31,422.00 and depreciated at a rate of $348.00 per month.

On August 1, 1995, Southland and Defendant entered into a fifth Transportation Agreement ("the fifth agreement") for the use of three tractors and three drivers to service Southland's Atlanta, Georgia loca-

---

1. According to Defendant's June 16, 1998 tabulation of Debtors' equipment obligation, the Orlando location was serviced by three tractors, one of which had an original value of $66,040.00; one of which had an original value of $75,284.00; and one of which had an original value of $46,812.00. (Def.Ex. 13.) The tractors depreciated at the rate of $584.21 per month, $694.94 per month, and $606.85 per month, respectively.

tion. (Def.Ex. 32.) The terms of the fifth agreement were identical to the terms of the second, third and fourth agreements, except that Southland agreed to pay Defendant a fixed weekly charge of $2,555.00 and a mileage charge of $.548 plus fuel charges. Southland agreed to pay Defendant $12.73 per stop. According to Schedule A of the fifth agreement, two of the tractors leased to Southland in Atlanta had an original value of $44,629.00 and depreciated at a rate of $452.81 per month. The other Atlanta tractor had an original value of $61,584.00 and depreciated at a rate of $677.22 per month.

On March 1, 1997, Jotan, Inc. ("Jotan") acquired the assets and assumed the liabilities of Southland by purchasing one hundred percent of the stock of the Southland Holding Company.[2]

In late 1997, Debtors' business began to falter under a large debt burden and Debtors began having difficulties meeting their obligations to material suppliers. On January 5, 1998, new management took over Debtors' operations. Raleigh C. Minor ("Minor") took over as chief executive officer of Jotan.

According to an internal, unaudited accounting filed as part of Debtors' Form 10–QSB quarterly report with the Securities and Exchange Commission, Debtors had a retained earnings deficit of $40,857,056.00 and an equity deficit of $36,936,348.00 on March 31, 1998. (Pl.Ex. 1.) According to the same accounting, Debtors also had a net operating loss of $1,381,859.00 in the quarter ending March 31, 1998.

On June 2, 1998, Defendant notified Debtors of Debtors' default under the five original transportation agreements (together "the original agreements"). Defendant asserted that Debtors owed delinquent payments totaling approximately $250,000.00.

On June 3, 1998, Minor met with officers of Defendant in order to negotiate a new transportation agreement that would allow Debtors to continue using Defendant's tractors and drivers and that would reschedule the past due balance on the original agreements. Debtors also desired to extinguish the equipment purchase obligation present in each original agreement.

Minor characterized this meeting as the beginning of some strong-arm negotiating by Defendant. Defendant possessed unusual leverage over Debtors. Debtors could not operate without Defendants' tractors and drivers, and Debtors could not secure an alternate source for the same services. Minor testified that Defendant used this leverage to force Debtors into a raw deal.

Defendant contends that it did not bully Debtors during these negotiations. Defendant asserts that these negotiations were conducted at arms-length, and that both parties shared a common goal of keeping Debtors' operations going long-term.

On June 12, 1998, Defendant notified Debtors that the original agreements would be terminated by the close of business that same day and offered to provisionally provide services to Debtors until June 17, 1998 in order for Debtors to decide whether or not to enter into a new transportation agreement. (Def.Ex. 6.) Debtors took up this offer of temporary

2. The Court notes that it will refer to the combined Jotan/Southland entity as "Debtors" over the remainder of the Findings of Fact and Conclusions of Law absent some relevant distinction aside from the vagaries of corporate structure formally distinguishing the two. On September 1, 2000, the Court entered an Order substantively consolidating the bankruptcy cases of Southland and Jotan. (Doc. 366.)

services ("the temporary transportation agreement").

On June 16, 1998, Minor faxed Defendant a letter protesting Defendant's "heavy-handedness" and unwillingness to budge from its terms. (Pl.Ex. 9.) Minor suggested a twenty-two month repayment schedule and a new ninety-day transportation agreement.

On June 17, 1998, Mandell faxed Minor a letter expressing Defendant's desire to be paid back completely within the term of any new transportation agreement, which would also have to provide that Defendant be paid in advance for tractor rental and use of drivers. (Pl.Ex. 7.) Mandell proposed that "[a]ll other moneys due Ryder (Approx. 175K) would be paid over 90 days in equal weekly installments which would be included on the weekly prepayment invoices." Mandell also reminded Minor of the impending termination of the temporary transportation agreement.

On June 19, 1998, Defendant and Debtors entered into a new one hundred and twenty-day Transportation Agreement ("the new agreement"). (Pl.Ex. 9.) Debtors acknowledged that Defendant was owed $227,786.24 in past due bills under the original agreements and acknowledged that the equipment purchase obligation under the original transportation agreements came to $494,612.00. A handwritten note at the end of the new agreement reserved Debtors' right to verify the $227,786.24 in past due bills. Under the new Transportation Agreement, Defendant "waived" the unpaid balance due under the original agreements and agreed to continue supplying Debtors with tractors and drivers.

Defendant also waived the equipment purchase obligation. Jotan agreed to guarantee the payment of all bills due under the new agreement.

The new agreement provided that Debtors would pay Defendant a fixed weekly charge of no less than $14,877.85 per week ("the minimum fixed charge") along with the prepaid charges for tractor rental, use of drivers, stops, fuel and the like ("operational charges"). Appendix A of the new agreement provided for a minimum fixed charge of $13,287.53 per week. The new agreement did not provide any itemization for the minimum fixed charge, and did not link the minimum fixed charge in any way to the provision of tractors and drivers to Defendant. The new agreement did provide that the minimum fixed charge would not be reduced by closure of any of Debtors' operations.

Debtors agreed to pay about the same amount in operational charges under the new agreement as they had under the original agreements.[3] Debtors agreed to pay $1,590.02 in operational fixed charges for the Orlando location, $1,363.44 for Winchester, $3,236.29 for Edison, and $2,555.00 for Atlanta. Debtors agreed to pay $.433/mile for operations out of Orlando, $.605 per mile for Winchester, $.681 per mile for Edison, and $.548 for Atlanta. Finally, Debtors agreed to pay $11.44 per stop around Orlando, $12.92 around Winchester, $16.87 around Edison, and $12.73 for a first stop and $7.63 for subsequent stops around Atlanta. Mandell admitted at his deposition that the charges under the new agreement, with the exception of the minimum fixed charge, "[look] like the

---

**3.** Appendix A of the new agreement does not provide for charges related to Debtors' operations in Syracuse. It is unclear exactly why Syracuse is not provided for. The Court assumes that the operations in Syracuse continued at the same cost as fixed in Schedule A of

the third agreement, which, like Schedule A of the other original agreements, was incorporated by reference into the new agreement where not contradicted by a provision of the new agreement.

same pricing" as the operational charges under the original agreements. (Pl.Ex. 19 at 25.)

Debtors also agreed to prepay the minimum fixed charge and the operational charges for the upcoming week by wire transfer every preceding Friday, upon receiving an estimate of the upcoming week's operational charges from Defendant. Defendant would credit any overpayments in later weeks.

The new agreement provided for an early termination penalty of $2,000.00 per day, assessable against Debtors only. Under the new agreement, Debtors could terminate service at any location with two weeks' notice after thirty days from the execution of the new agreement. Debtors were obligated to keep at least one location operating for the entire term of the new agreement.

During the term of the new agreement, Debtors internally accounted for the minimum fixed charge as an "old" charge. (Pl. Ex. 13.) Apparently Debtors considered the minimum fixed charge payments for credit on the old balance due under the original agreements. Debtors subtracted payments of the minimum fixed charge from the unpaid balance due on the original agreements.

The minimum fixed charge held constant at $13,287.53 per week over the entire term of the new agreement.

According to Debtors' internal account analysis, Debtors paid Defendant a total of $199,312.95 in minimum fixed charges from June 19, 1998 until October 9, 1998. (Pl. Ex. 17.)

According to Debtors' internal account analysis, Debtors paid Defendant a total of $ 93,102.71 in minimum fixed charges from

August 14, 1998 until October 9, 1998. (Pl.Ex. 17.)

The internal account analysis also notes a $13,176.93 overpayment not yet credited by Defendant. (Pl.Ex. 17.)

On July 7, 1998, Minor notified Defendant in writing that the Orlando facility would cease using Defendant's services as of July 20, 1998. (Def.Ex. 17.)

On August 6, 1998, Minor notified Defendant in writing that the Atlanta facility would cease using Defendant's services as of August 24, 1998. (Def.Ex. 18.)

On September 11, 1998, Minor notified Defendant in writing that the Edison facility would cease using Defendant's services as of September 15, 1998. (Def.Ex. 22.)

On October 2, 1998, Debtors made their final weekly wire transfer to Defendant.[4]

On October 9, 1998, Mandell notified Minor that a due and payable wire transfer had not been received and that Debtors were in default of the new agreement to the tune of $41,459.76. (Def.Ex. 24.)

On October 14, 1998, Defendant deemed the new agreement terminated due to Debtors' failure to cure the October 9, 1998 default. (Def.Ex. 26.)

On October 15, 1998, Defendant's attorneys wrote Debtors notifying them of the termination of the new agreement and requesting payment of $20,494.52— $14,494.52 in unpaid charges and $6,000.00 in liquidated damages. (Def.Ex. 26.)

On October 15, 1998, Minor wrote Defendant's attorneys stating that Defendant had breached the new agreement by providing non-compliant services at the Edison location in July 1998. (Def.Ex. 27.)

---

4. The Court notes that no direct evidence was entered on this fact. The Court therefore concludes that the last weekly payment was made on October 2 because Debtor failed to make the payment due on October 9, 1998 and all subsequent payments.

On November 10, 1998, Debtors filed a voluntary petition for Chapter 11 bankruptcy protection. (Doc. 1.)

On February 3, 1999, Defendant filed a Proof of Claim against Debtors' estate for $20,494.52. (Def.Ex. 36.)

On April 1, 1999, the Court entered a Notice converting the Chapter 11 Case to a case under Chapter 7. (Doc. 186.) The Court appointed Plaintiff as Chapter 7 Trustee by the same Notice.

Plaintiff testified at the trial on April 3, 2001 that about $20,000,000.00 in claims have been filed against Debtors, and that only about $2,000,000.00 will be available for distribution to general unsecured creditors. Plaintiff estimated that unsecured creditors would receive about ten to fifteen percent of their claims through distribution. Plaintiff further testified that all of Debtors' assets are fully encumbered by secured creditors.

On August 31, 2000, Plaintiff filed the instant Complaint to recover payments made to Defendant under the new agreement. (Adv.Doc. 1.) Plaintiff contends that transfers made on account of the minimum fixed charges within ninety days of the petition date constitute recoverable preferences under 11 U.S.C. § 547(b). Plaintiff further asserts that all of the transfers made on account of the minimum fixed charges under the new agreement may be recovered as fraudulent transfers under 11 U.S.C. § 548(a)(1)(B). Plaintiff finally alleges that the new agreement itself constitutes an obligation fraudulently incurred by Debtors under § 548(a)(1)(B).

On September 29, 2000, Defendant filed an Answer to the adversary Complaint. (Adv.Doc. 5.) On February 27, 2001, Defendant filed an Amended Answer. (Doc. 15.) Defendant counters that Plaintiff fails to establish a prima facie case for preference avoidance under § 547(b) and for fraudulent transfer avoidance under § 548(a)(1)(B). Defendant advances as affirmative defenses three of the exceptions to preference avoidance found in § 547(c): (1) the "contemporaneous exchange" exception of § 547(c)(1); (2) the "ordinary course of business" exception of § 547(c)(2); and (3) the "subsequent value" exception of § 547(c)(4). Defendant also asserts as an affirmative defense to Plaintiff's fraudulent transfer allegations that Defendant provided Debtors with reasonably equivalent value in exchange for the transfers made on account of the minimum fixed charges and in exchange for execution of the new agreement itself.

## CONCLUSIONS OF LAW

Plaintiff seeks to avoid the new agreement and/or the transfers thereunder as a fraudulent obligation and/or as fraudulent transfers under 11 U.S.C. § 548(a)(1)(B). Plaintiff also attacks the transfers on account of the minimum fixed charges under the new agreement as preferential under 11 U.S.C. § 547(b).

**I. THE NEW AGREEMENT AND PAYMENTS THEREUNDER: FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 548(a)(1)(B)?**

**A. The fraudulent transfer standard**

Section 548, in combination with § 550, allows a Chapter 7 trustee to avoid a transfer of a debtor's property or an incurring of an obligation by a debtor if such transfer or obligation resulted in actual or constructive fraud against a debtor's creditors. Section 548 provides, in relevant part:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the

filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1) (2001).

■ A trustee objecting to an obligation or transfer as constructively fraudulent bears the burden of proving by a preponderance two elements: (1) a debtor's insolvent or near-insolvent financial condition; and (2) that reasonably equivalent value was not provided in exchange for such obligation or transfer. *See Nordberg v. Arab Banking Corp. (In re Chase & Sanborn)*, 904 F.2d 588, 594 (11th Cir. 1990). The question of whether or not reasonably equivalent value has been provided for an obligation or transfer is a question of fact. *See id.* at 593.

### B. Application to the instant case

■ The Court finds that Plaintiff proved by a preponderance of the evidence that Debtors were insolvent at the time of the execution of the new agreement and at the moment all relevant transfers were made. Minor's testimony and correspondence as to Debtors' financial condition, in combination with the Form 10–QSB internal accounting introduced into evidence, sufficiently demonstrate the extent of Debtors' financial woes at the time Minor approached Defendant and inquired into the possibility of reaching a new agreement. Aside from pointing to the unaudited, internal nature of Debtors' Form 10–QSB accounting, Defendant did not present any evidence tending to undermine Plaintiff's evidence that Debtors were insolvent from January 1998 until the petition date.

■ The Court further finds that Plaintiff failed to prove by a preponderance of the evidence that Debtors did not receive reasonably equivalent value in exchange for entering into the new agreement and for making transfers on account of the obligations therein. In exchange for Debtors' incurring new obligations under the new agreement, Defendant agreed to forebear permanently from exercising the equipment purchase obligation option, agreed to forebear from immediate withdrawal of the tractors and drivers essential to Debtors' operations, agreed to a shortened contract term, and agreed to allow Debtors to terminate the new agreement with respect to all of the locations save any one with short notice. Defendant therefore provided sufficient consideration to Debtors for the new agreement. Such consideration extends to the payments made on account of any obligations incurred by Debtors under the new agreement, such as the obligation to pay the minimum fixed charges.

Therefore the Court finds that Plaintiff failed to carry his burden of proving that any fraudulent transfer occurred in the instant case.

## II. PAYMENTS MADE WITHIN NINETY DAYS BEFORE THE PETITION DATE: AVOIDABLE AS PREFERENTIAL TRANSFERS UNDER 11 U.S.C. § 547(b)?

### A. Prima facie case of preferential transfer under § 547(b)

#### 1. The § 547(b) standard

Section 547(b), in combination with § 550, allows a Chapter 7 trustee to avoid a transfer of property of a debtor as a preference. Section 547(b) provides, in relevant part:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> > (1) to or for the benefit of a creditor;
> > (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> > (3) made while the debtor was insolvent;
> > (4) made—
> > > (A) on or within 90 days before the filing of the petition; or
> > > (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> > (5) that enables such creditor to receive more than such creditor would receive if—
> > > (A) the case were a case under chapter 7 of this title;
> > > (B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (2001).

■ A trustee seeking to avoid a transfer as a preference under § 547(b) bears the burden of proving the existence of all of the elements of the § 547(b) standard by a preponderance of the evidence. *See Grant v. Sun Bank/North Central Florida (In re Thurman Construction, Inc.)*, 189 B.R. 1004, 1009 (Bankr.M.D.Fla.1995).

#### 2. Application to the instant case

##### a. To or for the benefit of a creditor

■ The Court finds that Plaintiff proved by a preponderance that the transfers in question, the portion of each weekly wire transfer made on account of the minimum fixed charge, were transfers made to a creditor, namely Defendant. Defendant is a creditor by virtue of the Proof of Claim it filed against Debtors' estate.

■ Further, the Court finds that these payments benefited Defendant by adding cash to its coffers.[5]

##### b. For or on account of an antecedent debt owed by debtor before such transfer is made

■ The Court finds that Plaintiff proved by a preponderance that the transfers in question were made on account of an antecedent debt. Specifically, the Court finds that the $93,102.71 paid by Debtors to Defendant on account of the minimum fixed charge during the ninety-day period before the petition date constituted payments on account of the old balance under the original agreements. That

---

**5.** The Court notes that the "benefit" inquiry does not require it to delve into whether Defendant benefited **unfairly** from the transfers it received. That question is reserved for the "Chapter 7 analysis," subsection (e.) below.

old balance clearly accumulated antecedent to the transfers made under the new agreement.

Plaintiff proved by a preponderance of the evidence that the transfers made on account of the minimum fixed charges were made as installment payments on the agreed $227,786.24 balance under the original agreements. First, Plaintiff brought forward evidence of the close mathematical correlation between the old balance and the minimum fixed charges to be paid over the term of the new agreement. The total minimum fixed charges to be paid out over the lifetime of the new agreement equaled $225,888.01, $1,898.23 less than the agreed balance. Second, Plaintiff brought forward evidence that repayment of the old balance was Defendant's top priority in negotiating the new agreement, and that Defendant favored the payment of the agreed balance in installments over the life of any new agreement. Mandell's June 17, 1998 letter included the demand that "[a]ll other moneys due Ryder ... would be paid over 90 days in equal weekly installments which would be included on the weekly prepayment invoices." Under the new agreement the repayment term stretched to one hundred and twenty days, but otherwise this demand was exactly incorporated into the new agreement in the form of the weekly minimum fixed charge.

The Court finds unconvincing Defendant's contention that the portion of the wire transfer prepayments allocated to the minimum fixed charge was made on account of the following week's operational charges, the actual charges for use of tractors, drivers, fuel, stops and the like. First, the operational charges under the original agreements carried over almost exactly into the new agreement. The fact that the operational charges remained the same under the new agreement leads the Court to conclude that any additional charges under the new agreement, such as the minimum fixed charge, were made in exchange for some non-operational consideration provided by Defendant upon the execution of the new agreement, such as the "waiver" of the old balance or the waiver of the equipment purchase obligation. The Court also finds persuasive the fact that, under the new agreement, the minimum fixed charge would not be diminished in the event that Debtors ceased operating at any location. That provision disavows any link between charges for future operations and the minimum fixed charge.

The Court also finds unconvincing Defendant's argument that the minimum fixed charge is sacrosanct as consideration for a novation of the old balance under the original agreements. The Court finds that paying nearly the exact amount of an old debt in installments as consideration for a "waiver" of the old debt and unabashedly paying installments as consideration for credit on the old debt are indistinguishable for preference purposes. As Plaintiff's counsel eloquently put it, calling a transfer made on account of an antecedent debt non-preferential as consideration for a "novation" of the antecedent debt is equivalent to painting stripes on a horse and calling it a zebra. In any event, any "waiver" of the old balance occurred upon execution of the new agreement—the "novation"—antecedent to any transfers made on account of the minimum fixed charges as consideration for such waiver, and therefore constitute transfers made on account of antecedent debt.

The Court finally finds unpersuasive Defendant's argument that the transfers made on account of the minimum fixed charges were made on account of the waiver of any oppressive terms of the original agreements in the new agreement.

Defendant argues that the minimum fixed charges were made on account of the waiver of the equipment purchase obligation and on account of the waiver of the long term and long termination notice periods of the original agreements. Plaintiff's evidence that the minimum fixed charges corresponded almost exactly to the old balance belies Defendant's assignment of value to the waiver of the oppressive terms of the original agreements. The close mathematical relationship between the minimum fixed charges and the old balance under the original agreements leads the Court to conclude that the minimum fixed charges were made on account of that old balance and nothing else. In any event, the waiver of the oppressive terms of the original agreements occurred upon execution of the new agreement, antecedent to any transfers made thereunder.

The Court concludes that the transfers made on account of the minimum fixed charges constitute disguised transfers made on account of the old balance under the original agreements, a debt antecedent to the transfers made during the preference period. The Court rejects Defendant's alternative explanation for the minimum fixed charges as contrary to the evidence and as legally ineffective.

## c. Made while the debtor was insolvent

### i. The presumption of insolvency: 11 U.S.C. § 547(f)

Section 547(f) provides that, for preference purposes, a debtor is presumed to be insolvent during the ninety-day preference period.

### ii. Application to the instant case

The Court finds that Plaintiff proved by a preponderance of the evidence that Debtors were insolvent during the entire ninety-day preference period. Plaintiff introduced evidence of Debtors' insolvency in the form of the Form 10–QSB accounting and the testimony and correspondence of Minor. Further, Defendant did not present any evidence contradicting Plaintiff's evidence or undercutting the presumption of insolvency.

## d. Made on or within ninety days before the date of the filing of the petition

The Court finds that Debtors paid Defendant a total of $93,102.71 on account of the minimum fixed charges during the ninety-day preference period.

## e. That enables such creditor to receive more than such creditor would receive if the case were a case under Chapter 7 of this title

The Court finds that the payments made on account of the minimum fixed charges enabled Defendant to receive more than Defendant would have received in this Chapter 7 case had such payments not been made. During the preference period Defendant received $93,102.71 on account of the agreed $227,786.24 old balance under the original agreements. Debtors also paid some $106,210.24 in minimum fixed charges outside of the preference period, thus reducing the old balance to $121,576.00 at the beginning of the preference period. Therefore, during the preference period the old balance fell from $121,576.00 to $28,473.29, an almost seventy-seven percent reduction. Defendant did not enter any evidence disputing these figures.

The Court finds that Defendant, an unsecured creditor, would have received considerably less than seventy-seven percent on the old balance in pro rata distribution. Plaintiff testified that unsecured

creditors could expect about a ten to fifteen percent distribution. Defendant did not offer any evidence contradicting Plaintiff's testimony.

Therefore, the Court finds that Plaintiff brought forward sufficient evidence to prove by a preponderance that Debtors' payment of the $93,102.71 on account of the minimum fixed charges under the new agreement constitutes a preferential transfer of Debtors' assets under § 547(b). Plaintiff brought forward evidence satisfying all five of the requirements of § 547(b).

## III. DEFENDANT'S AFFIRMATIVE DEFENSES TO AVOIDANCE UNDER 11 U.S.C. § 547(c)

A trustee may not avoid a transfer of a debtor's property even if the transfer was preferential under § 547(b) if a creditor can establish that the transfer fits into one of the exceptions to avoidance of a preferential transfer found in § 547(c).

■ Because the exceptions found in § 547(c) function as affirmative defenses, a creditor seeking exception to avoidance bears the burden of proving their application to a case by a preponderance of the evidence. *See Official Unsecured Creditors' Committee v. Airport Aviation Services, Inc. (In re Arrow Air)*, 940 F.2d 1463, 1465 (11th Cir.1991).

### A. The "contemporaneous exchange" exception: § 547(c)(1)

#### 1. The "contemporaneous exchange" standard

Under § 547(c)(1), a trustee may not avoid a transfer found preferential under § 547(b) to the extent that the transfer was part of a contemporaneous exchange that provided new value to a debtor. Section 547(c)(1) provides, in relevant part:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange ...

11 U.S.C. § 547(c)(1) (2001).

■ A creditor asserting a contemporaneous exchange exception must prove by a preponderance (1) that the creditor extended new value to a debtor in exchange for a payment or transfer; (2) that an exchange of payment for new value was intended by the debtor and the creditor to be contemporaneous; and (3) that the exchange was in fact substantially contemporaneous. *See Arrow Air*, 940 F.2d at 1465.

#### a. "New value"

#### b. The definition of "new value"

"New value" is defined in § 547(a)(2). Section 547(a)(2) provides, in relevant part:

(a) In this section—

(2) "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

11 U.S.C. § 547(a)(2) (2001).

■ Release of or credit on a debtor's preexisting obligation does not qualify as "new value" under § 547(a)(2). *See Chase & Sanborn*, 904 F.2d at 596. In *Chase & Sanborn*, a creditor asserting a § 547(c)(1) defense proposed that the diminution of a

debtor's guarantee obligation functioned as "new value" conferred in exchange for a preferential transfer under § 547(a)(2). *See id.* at 595. The court of appeals rejected this argument on the grounds that a debtor's payment for release of or for credit on a contingent, antecedent obligation represents the very sort of transfer that § 547(b) was enacted to avoid. *See id.* at 595–596. "If 'new value' included credit toward such debts, thus rendering such transfers categorically unavoidable, section 547 would be rendered a tautological nullity." *Id.*

 Additionally, an agreement by an undersecured creditor to waive its right to foreclose on collateral essential to a debtor's operations in order to allow a debtor to continue operating does not qualify as "new value" under § 547(a)(2). *See Wendel v. Leasing Service Corp. (In re Air Conditioning of Stuart)*, 845 F.2d 293, 298 (11th Cir.1988). "Forbearance from exercising pre-existing rights does not constitute new value within § 547(c)(1) as defined by § 547(a)(2)." *See id.*

 A creditor seeking to except a preferential transfer from avoidance under § 547(c)(1) must supply proof of the specific dollar value of any "new value" provided in exchange for the transfer. *See Jet Florida, Inc. v. American Airlines, Inc. (In re Jet Florida Systems, Inc.)*, 861 F.2d 1555, 1559 (11th Cir.1988). A creditor asserting a § 547(c)(1) defense must show that a preferential transfer conferred actual economic benefit upon a transferee/debtor, rather than merely showing that a transferee/debtor and creditor **intended** some hypothetical or ephemeral value to be conferred. *See id.* at 1558–1559. If § 547(a)(2) merely required proof that a creditor provided any consideration for a transaction, then § 547(b) would be reduced to an anti-fraud provision.[6]

### c. Application to the instant case

 The Court finds that Defendant failed to prove by a preponderance of the evidence that it provided "new value" to Debtors in exchange for the transfers made on account of the minimum fixed charges.

The Court rejects Defendant's argument that the continuing provision of tractors and drivers constitutes "new value" provided for the transfers made on account of the minimum fixed charges. The Court reiterates its finding that the minimum fixed charges did not relate to operational charges, but rather acted as installment payments on the balance from the original agreements.

 The Court finds that credit on the balance from the original agreements does not constitute "new value" under § 547(a)(2). As the *Chase & Sanborn* court explained, all transfers deemed preferential under § 547(b) are by definition made in exchange for credit on antecedent obligations.[7] If such credit were to be

---

6. The Court notes that the requirement of specific proof of valuation separates the § 547(a)(2) "new value" test from the § 548 "reasonably equivalent value" concept—the former is an economic analysis, while the latter is merely an anti-fraud provision. It is this distinction that allows a court to conclude that a preferential transfer is not fraudulent under § 548 because "reasonably equivalent value" was given and at the same time to conclude that the same preferential transfer may be avoided because insufficient "new value" was provided to satisfy § 547(c)(1) or § 547(c)(4). Not all consideration qualifies as "new value."

7. If a preferential transfer were made on an antecedent debt and credit was not granted toward the antecedent debt, then the transfer would be fraudulent for lack of any consideration as well as preferential. In the instant case, the transfers at issue are not fraudulent, because credit was apparently given for the transfers. Once again, the Court notes that

deemed "new value," then all § 547(b) preferential transfers would qualify under this element of the § 547(c)(1) exception, rendering it meaningless. Surely Congress did not intend to enact a meaningless standard. Therefore, Congress must have intended that something more than mere credit on an antecedent obligation must be conferred in exchange for a preferential transfer in order to satisfy the "new value" element of § 547(c)(1).

The Court finds that Defendant's waiver of the equipment purchase obligation and of other oppressive terms of the original agreements do not constitute "new value" under § 547(c)(1). First, the Court finds that the transfers made on account of the minimum fixed charges were not made in exchange for waiver of the oppressive terms of the original agreements. The minimum fixed charges correlate almost exactly with the old balance, and the old balance appears from Mandell's correspondence with Minor to be of primary importance to Defendant. If Defendant had intended to be compensated for waiver of the oppressive original agreement terms in addition to being paid the old balance, than certainly it would have requested more in minimum fixed charges than it did.

■■■■ Even if the Court were to assume that the parties intended a waiver of the oppressive original agreement provisions to act as some value given in exchange for transfers made on account of the minimum fixed charges, the Court does not find such waiver sufficient "new

value" under § 547(a)(2). The value provided to Debtors in exchange for payments purportedly made on account of the waiver of the oppressive original agreement provisions was Defendant's forbearance from exercising the highly contingent right to obtain a judgment against Debtors for breach of contract on the basis of those provisions. Such forbearance does not constitute "new value" under § 547(a)(2) per the decision of the court of appeals in *Air Conditioning of Stuart*. The forgiveness of an antecedent, highly contingent obligation does not qualify as "new value" under § 547(a)(2).

■■■■ Additionally, the Court finds that Defendant failed to provide evidence of the specific economic worth of any "new value" provided to Debtors in exchange for the transfers made on account of the minimum fixed charges. Defendant did provide evidence of the maximum value of its proposed "new value"—$227,786.24 in "waived" old balance plus about $494,612.00 for waiver of the new equipment obligation. However, these maximum values do not reflect the actual value of the "waiver" of the old balance and of the waiver of the equipment purchase obligation in light of Debtors' extremely strained financial condition at the execution of and during the term of the new agreement. The Court notes that it is likely that the proposed "new value" provided by Defendants was almost worthless.[8] Evidence of hypothetical value does

the fact that the anti-fraud provisions were satisfied does not necessarily mean that the preference provisions were satisfied.

8. The Court notes that it appears that Defendant acknowledged the worthlessness of the equipment purchase obligation by not adding any additional amount to the fixed minimum charge to compensate for waiver of the equipment purchase obligation. Defendant insisted upon being paid the old balance as the

absolute requirement for a new agreement; therefore it can be presumed that the minimum fixed charge first went toward paying back the old balance. The fixed minimum charge provides almost exactly for the repayment of the old balance, and for nothing of second priority. Therefore, it appears that Defendant simply waived the equipment purchase obligation for nothing.

not satisfy the specific proof requirement of *Jet Florida*. Defendant proved that it surrendered $722,398.24 in hypothetical dollars in potential judgments against Debtors. But Defendant did not prove that it surrendered any real dollars of the sort Debtors paid it in exchange for its hypothetical sacrifice during the ninety days prior to the petition date.

The Court finds that, because Defendant failed to prove by a preponderance that it provided "new value" to Debtors in exchange for the preferential transfers made on account of the minimum fixed charges and failed to provide specific evidence of the actual worth of any "new value" conferred, Defendant's "contemporaneous exchange" defense under § 547(c)(1) must fail. The Court finds it appropriate, however, to briefly address the remaining elements of the § 547(c)(1) test for the sake of complete disposition of this dispute.

### i. Intent that exchange be contemporaneous

█ The Court finds that Defendant failed to prove by a preponderance that both Debtors and Defendant intended for the transfers made on account of the minimum fixed charges to act as a contemporaneous exchange for new value. Plaintiff brought forward evidence, in the form of Debtors' account analysis, that Debtors intended for the transfers made on account of the minimum fixed charges to act as payments on the old balance. Defendant did not bring any evidence refuting this evidence of Debtors' intent. Therefore, Defendant failed to prove by a preponderance that both parties intended the transfers made on account of the minimum fixed charges to function as part of a contemporaneous exchange.

### ii. Actual contemporaneous exchange

█ The Court finds that Defendant failed to prove by a preponderance that

the transfers made on account of the minimum fixed charges were made as part of an actual contemporaneous exchange. The transfers made on account of the minimum fixed charges were made in exchange for credit on the old balance built up under the original agreements. Any value given by Defendant in exchange for the accrual of the old balance had been conferred upon Debtors long before any transfers were made under the new agreement, and therefore the conferral of such value was not contemporaneous with Debtors' payment for it every week during the preference period. Additionally, even if the Court considered the new agreement's "waiver" of the old balance and waiver of the oppressive terms of the original agreements to be "new value" under § 547(a)(2), such value was conferred upon execution of the new agreement, long before the transfers made during the preference period.

### 2. The "ordinary course of business" exception: § 547(c)(2)

### i. The "ordinary course of business" standard

Under § 547(c)(2), a trustee may not avoid a preferential transfer under § 547(b) to the extent that the transfer was made in the ordinary course of business between a debtor and a creditor. Section 547(c)(2) provides, in relevant part:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms ...

11 U.S.C. § 547(c)(2) (2001).

██ A debt or transfer may be deemed incurred or made outside of the ordinary course of business if a creditor utilizes unusual debt collection efforts to procure the transfer, such as a refusal to deliver merchandise until old invoices are paid. *See Braniff, Inc. v. Sundstrand Data Control, Inc. (In re Braniff, Inc.),* 154 B.R. 773, 781 (Bankr.M.D.Fla.1993).

#### ii. Application to the instant case

██ The Court finds that Defendant failed to prove by a preponderance of the evidence that the transfers made on account of the minimum fixed charges or the new agreement itself were made in the ordinary course of business. Specifically, the Court finds that the evidence of Defendant's coercive negotiation strategy undermines Defendant's claim that the transaction was ordinary. Ordinary transactions do not involve threats to shut one of the parties down unless it capitulates to all of the powerful party's terms. In fact, the existence of such coercion is characteristic of a preferential transaction. An unsecured creditor must not be allowed to improve its position in an impending bankruptcy through the inflexible use of unusual leverage. That is exactly what happened in the instant case. The Court will not condone strong-arm tactics employed for the purpose of sucking dry a dying debtor as "ordinary business."

#### 3. The "subsequent value" exception: § 547(c)(4)

#### i. The "subsequent value" standard

Under § 547(c)(4), a trustee may not avoid a preferential transfer under § 547(b) to the extent that a creditor gave new value to a debtor subsequent to the

transfer. Section 547(c)(4) provides, in relevant part:

(c) The trustee may not avoid under this section a transfer—

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor ...

11 U.S.C. § 547(c)(4) (2001).

██ In order to except a portion of a preferential transfer from avoidance under § 547(c)(4), a creditor must establish by a preponderance that (1) the creditor extended any alleged new value after receiving a preferential transfer; (2) the new value was unsecured; and (3) the new value remains unpaid. *See Charisma Investment Company, N.V. v. Airport Systems, Inc. (In re Jet Florida, Inc.),* 841 F.2d 1082, 1083 (11th Cir.1988). "A subsequent advance is excepted [from avoidance] because it is reasoned that a creditor who contributes new value in return for payments from the incipient bankrupt, should not later be deemed to have depleted the bankruptcy estate to the disadvantage of other creditors." *Id.*

██ Value advanced after a preferential transfer does not constitute "new value" for § 547(c)(4) purposes unless the value advanced actually benefited a debtor. *See Air Florida,* 841 F.2d at 1083. In *Air Florida,* a creditor sought to except from avoidance $11,761.33 of a preferential rent payment on the grounds that creditor had advanced the debtor "new value" subsequent to the payment by leaving the leased premises available for the debtor's use. *See id.* at 1083. The court of appeals

rejected this argument. *See id.* at 1083–1084. The court of appeals first noted that allowing a creditor to keep a portion of a preferential payment under the subsequent value exception does not compromise equality of treatment among creditors " 'because its utility is limited to the extent to which the estate was enhanced by the creditor's subsequent advances during the preference period.' " *Id.* (quoting 4 *Collier on Bankruptcy,* ¶ 547.12, at 547–49 n. 5 (1987).). Therefore, a creditor may only except from avoidance subsequently advanced, unpaid-for value if that value conferred a "material benefit" upon a debtor and thus enhanced a debtor's bankruptcy estate. *See id.* Forbearance of repossession of property not in use by a debtor does not constitute "material benefit" so as to qualify as "new value" for purposes of the § 547(c)(4) exception from avoidance. *See id.* "[T]his lease was, and continued to be, a financial drain on the estate, and the debtor was placed in the financially precarious position of having to pay rent for property it could not beneficially use." *Id.*

**ii. Application to the instant case**

The Court finds that Defendant failed to prove by a preponderance of the evidence that it should be allowed to keep $14,494.52 of the preferential payments it received from Debtors under the "subsequent value" exception. Specifically, the Court finds that any value conferred upon Debtors subsequent to the last preferential payment did not provide a material benefit to the estate. Defendant did not bring forward any evidence that Debtors actually used Defendant's tractors and drivers after October 2, 1998, when the last preferential payment was made. In the absence

of such evidence, the Court concludes that Debtors did not use any of Defendant's tractors or drivers after the final preferential payment. Only the provision of tractors and drivers by Defendant could have enhanced Debtors' bankruptcy estate by allowing Debtors to continue operations for a short time. However, such provision was not made, and therefore any value provided to Debtors after the last preferential payment did not materially benefit Debtors and thus does not fall under the § 547(c)(4) exception to avoidance.

Therefore, the Court finds that Defendant may not except from avoidance under § 547(c)(4) any portion of the preferential payments received by it. Defendant is entitled to an unsecured claim for the unpaid balance due under the new agreement, barring any successful objections to such claim by Plaintiff on other grounds.[9]

**CONCLUSION**

The Court finds that Plaintiff failed to prove by a preponderance that any § 548(a)(1)(B) fraudulent transfers occurred. The Court finds that Plaintiff successfully proved by a preponderance that the $93,102.71 in transfers made by Debtors to Defendant on account of the minimum fixed charges during the ninety days prior to the petition date are avoidable preferences under § 547(b). The Court finally finds that Defendant failed to prove by a preponderance that any portion of those preferential transfers should be excepted from avoidance under § 547(c).

The Court will enter a separate Judgment in accordance with these Findings of Fact and Conclusions of Law.

---

**9.** The Court notes that it need not address Plaintiff's claim that Debtors actually overpaid Defendant under the new agreement at

this time. That dispute is better addressed in the context of an objection to Defendant's claim in the main Case.